**MAPLE ISLAND FARM, Inc.**
v.
**BITTERLING.**
No. 14455.

United States Court of Appeals
Eighth Circuit.

Jan. 11, 1954.

Rehearing Denied March 30, 1954.

868

Pierce Butler, St. Paul, Minn. (M. J. Doherty and Doherty, Rumble & Butler, St. Paul, Minn., were with him on the brief), for appellant.

Warren E. Burger, St. Paul, Minn. (Roland J. Faricy, Richard A. Moore, B. Warren Hart and Faricy, Moore & Costello, St. Paul, Minn., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

Maple Island Farm, Inc., a Minnesota corporation having its principal place of business at Stillwater, Minnesota, has long been engaged in manufacturing and selling powdered milk (among other things), and beginning in 1946 large quantities of its powdered milk were

sold in Mexico and Venezuela. This action was brought against the corporation by Walter Bitterling as plaintiff, to recover sums of money for which he claimed the defendant became indebted to him, in connection with the sales of powdered milk in those countries. The amended complaint set forth two causes of action, the first based upon defendant's Mexican business, and the second upon its Venezuelan business. There was federal jurisdiction because of diversity of citizenship and amount involved. Maple Island Farm, Inc. v. Bitterling, 8 Cir., 196 F.2d 55. On trial to the court without a jury the plaintiff had judgment on his first cause of action for $26,833.91 with interest, and on the second cause of action for two amounts aggregating $125,548.34, with interest, less an offset in the sum of $4,140.54, with interest. Defendant Maple Island Farm, Inc., appeals.

For his first cause of action plaintiff alleged:

"That between August 30, 1945, and December 31, 1946, at the special instance and request of defendant the plaintiff rendered services to the defendant with respect to defendant's exporting its products into Mexico, including counsel and advice with respect to the procedures, practices and commercial customs involved in exporting its products, and in the plans and programs for sales promotion of its products in Mexico and for the selection, appointment and establishment of Centro Mercantil de Monterrey, S. A. as importer and distributor for the defendant in Mexico for the distribution and sale of defendant's powdered milk products in Mexico, upon defendant's express agreement and promise that the defendant would pay the plaintiff for his services a commission of one cent (1¢) per pound on all powdered milk products thereafter distributed by the defendant in Mexico through Centro Mercantil de Monterrey".

"That the plaintiff fully and faithfully performed the agreement described in the preceding paragraph and that defendant has since the date first mentioned in the preceding paragraph sold and distributed through Centro Mercantil de Monterrey in excess of two million pounds (2,000,000) of its powdered milk products, and plaintiff on information and belief therefore alleges that he has earned and is entitled to receive a commission of not less than $20,000; that the plaintiff has demanded payment of said commission and defendant has failed and refused to pay the same."

Wherefore, plaintiff prayed for judgment against the defendant in the amount of $20,000, interest and costs.

Defendant admitted in its amended answer that since and including 1946 it had sold and shipped into Mexico for sale through Centro Mercantil de Monterrey S. A., as distributor, upwards of two million pounds of its powdered milk, but denied the other allegations of the complaint and prayed dismissal thereof.

The evidence introduced on the trial of the case tended to show that plaintiff first learned of defendant's contemplated export of powdered milk in September, 1945. Plaintiff at that time was employed by Corporacion Americana and living in Caracas, Venezuela. Except for relatively short periods of time spent in the United States, he had lived and worked in various countries in Central and South America since 1935. Most of this time was spent in Venezuela working for American-controlled companies. During these years plaintiff had acquired a command of the Spanish language and had become familiar with the business and social customs of these Spanish-speaking countries. He did not, however, have any experience in importing and exporting, nor did he have any knowledge concerning the manufacture and sale of powdered milk and other dairy products. In addition to being employed by Corporacion Americana, plaintiff owned one-half interest in and

was president of Compania Commercial Ultramar (hereafter referred to as Ultramar), a Venezuelan corporation organized to represent foreign manufacturers in Venezuela.

Plaintiff called at defendant's office in Stillwater for the express purpose of negotiating an agreement whereby either he or Ultramar would be named the exclusive agent for the importing and marketing of defendant's powdered milk in Venezuela. Plaintiff met the principal officers of defendant company and general discussions were had concerning world markets to which defendant's powdered milk might be profitably exported. Venezuela and Mexico were discussed as possible outlets for defendant's product. R. M. Hadrath, general manager of defendant company, conducted plaintiff through defendant's plants at Stillwater and in Wisconsin, explaining the productive processes, capacities, etc., of the various plants. Plaintiff realized that the possibility of defendant exporting its product into Spanish-speaking countries presented a real opportunity for him to secure a gainful connection in such export business. He therefore endeavored to convince Hadrath and the other officers of defendant that Venezuela was by far the most important market in Central or South America and that by reason of his knowledge of the language and customs of that country he should be selected to represent defendant there. Plaintiff proposed a form of contract he desired to be executed between defendant and Ultramar. It provided that Ultramar would be the sole and exclusive agent for the sale of defendant's products in all Central and South American countries and that the term of the agreement would be for ten years. Defendant, however, positively refused to enter into such an agreement.

At this first meeting between the parties, plaintiff told defendant's officers that it was very important to select a name for its powdered milk that would appeal to the Spanish-speaking people of Central and South America. He illustrated how clumsy and unharmonious "Maple Island" would be for a native to pronounce. Plaintiff suggested that the name "Valle Verde" (meaning "Green Valley") would be an appropriate name for defendant's product. No one at defendant's office in Stillwater could read or speak Spanish so undoubtedly defendant followed plaintiff's suggestion in adopting "Valle Verde" as its trade name for powdered milk exported to Spanish-speaking countries. Plaintiff also volunteered suggestions in regard to the Spanish composition of directions to be placed on the labels of cans for export. He further suggested that the trade name "Valle Verde" be registered "to protect defendant from unauthorized use of it by unscrupulous persons."

Plaintiff left defendant's office at Stillwater and returned to Chicago without having obtained a contract to represent defendant in the sale of powdered milk in Venezuela. However, negotiations between the parties were continued by correspondence and telephone.

In November, 1945, Hadrath decided to go to Mexico to investigate export opportunities and, if the market appeared favorable, to select a distributor there. Plaintiff accompanied Hadrath on this trip. Although plaintiff had never done business in Mexico he knew the language and had obtained and informed Hadrath of the names of prospective distributors there. Plaintiff testified that while on the plane enroute to Mexico he suggested to Hadrath a proposed contract which would require defendant to pay plaintiff one cent (1¢) per pound commission on all powdered milk sold through whatever Mexican distributor was selected. Plaintiff further testified that Hadrath said he thought the proposal was reasonable and would confirm it with Mr. Stoltze, the owner of defendant company, on their return to Stillwater. Hadrath emphatically denied that such a conversation had ever taken place and testified that he first learned plaintiff was claiming a 1¢ per pound commission on Mexican sales at the time this suit was filed. Stoltze testified that Hadrath had never said anything to him

regarding the alleged contract proposed by plaintiff. After arriving in Mexico, the first prospective distributor Hadrath and plaintiff called on had a representative who spoke perfectly good English and had long experience in importing and selling United States products in Mexico. His company had also handled milk powder. In Hadrath's experienced judgment this company, Centro Mercantil de Monterrey, was qualified to act as distributor of defendant's powdered milk and it was later chosen to represent defendant in that capacity.

After their return from Mexico and before plaintiff left Stillwater, Hadrath gave him a check for $5,000. Exactly what items this $5,000 check was intended to cover is in dispute. Plaintiff testified that it was advanced to him to begin operations in Venezuela. Hadrath was equally as positive that the check was not an advance or loan but was intended to cover plaintiff's expenses and services in connection with the Mexican trip. It was recorded on the books of defendant as a "selling expense" and charged to the powdered milk account. Plaintiff accepted the check and received the proceeds thereof.

Upon the basis of the above evidence, the trial court made the following findings of fact:

"There was an oral agreement between the parties for the defendant to pay the plaintiff a commission of 1 cent a pound on milk sold in Mexico through a distributor.

"That the amount of defendant's shipments to the Mexican distributor between August 1946 and March 30, 1950, was 2,682,091 pounds.

"That plaintiff performed services for defendant at defendant's express request in connection with the commencement of defendant's export business and the commencement of export business to Mexico for which he has not been compensated in any form and which under all the circumstances and independent of any express contract have a reasonable value of 1 cent per pound for the sales made in Mexico [to wit: 2,-682,091 lbs.]"

Pursuant to its findings of fact the court made declaration of law as follows:

"3. The plaintiff performed and rendered valuable services to defendant at its special instance and request relating to defendant's entry into the export market and in relation to distribution of its powdered milk in Mexico under and pursuant to a promise by defendant that plaintiff would be compensated for his services and his expenses, and without reference to any enforceable express contract plaintiff is entitled to judgment against the defendant for the reasonable value of the services he rendered, and the reasonable value thereof is one cent per pound for such sales (aggregating $26,833.91) with interest."

Judgment was accordingly entered for that sum upon the first cause of action.

■ Although the first cause of action alleged and sought recovery for breach of an express contract, it is apparent from the findings of fact and conclusion of law above quoted that the trial court granted recovery upon the theory of quantum meruit. After an exhaustive review of the record and considering the evidence in the light most favorable to the prevailing party, which we must, we are firmly convinced that the finding that plaintiff was entitled to a judgment of one cent per pound for services rendered in connection with defendant's Mexican sales was clearly erroneous and cannot be allowed to stand. Findings of fact are "clearly erroneous" within the meaning of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., if they are against the clear weight of the evidence. Kasper v. Baron, 8 Cir., 1953, 207 F.2d 744; Aetna Life Ins. Co. v. Kepler, 8 Cir., 116 F.2d 1.

■ It is elementary in the law governing quantum meruit recovery for work and labor that "no recovery may be had for services performed, without thought of direct cash compensation, for

business reasons" and "no recovery can be had for preliminary services that are performed with a view to obtaining business through a hoped for contract * * *" 71 C.J., Work & Labor, secs. 7 and 9. The conclusion seems inescapable that any services performed by plaintiff, including counsel and advice, in connection with the Mexican sales were rendered in the hope and expectation of obtaining a gainful connection in defendant's contemplated export of powdered milk to Venezuela. There are many compelling reasons which lead to this conclusion. Plaintiff testified, "I was particularly interested in Venezuela because of the largeness of the market, plus the fact that Venezuela was then and still is one of the few countries in the world that had access to dollar funds, and could pay for their products in a dollar exchange", and further, " * * * in my point of view Venezuela itself was by far the most important single market and probably in itself more important than a number of the other markets all put together". Plaintiff was then located in Venezuela and he apparently had contacts there, so that he expected to have very profitable employment if he was selected to represent defendant there on a commission basis. He was interested in obtaining contracts between foreign manufacturers and Ultramar, a Venezuelan corporation in which he owned 50% of the stock. The Mexican trip itself afforded plaintiff an opportunity to study the importing and marketing of powdered milk in a Spanish-speaking country, as he admittedly had no previous experience in this line of work and if he hoped to represent defendant in Venezuela he would have to become acquainted with marketing conditions. It is important to note that during the protracted negotiations between the parties, both before and after the Mexican trip, plaintiff remained on his job with Corporacion Americana and sustained no loss of time from that employment on account of anything he did to obtain the more attractive hoped for connection with defendant. On the record as a whole, we believe the evidence clearly establishes that plaintiff did not expect cash compensation for any services, including counsel and advice, rendered in connection with defendant's Mexican sales, but his volunteered services were wholly incidental to the negotiations leading up to the selection of plaintiff as defendant's representative in the much larger market of Venezuela, which result was eventually accomplished.

Although recovery upon the first cause of action was based upon quantum meruit, in view of the statement of the trial court in its written opinion that, "The sum due the plaintiff will be identically the same whether made under the law of contracts or on quantum meruit the two theories alleged in the complaint and proved by a preponderance of the evidence in the case", we deem it necessary to discuss the question of whether plaintiff could have recovered upon any express contract.

According to the plaintiff's testimony there was no contract between him and defendant when he and Hadrath commenced their airplane flight to Mexico. His claim was that an agreement was entered into while they were up in the airplane.

He claimed the conversation that took place there without witness or memorandum constituted the contract. But in answer to the question put to him he gave accounts of the claimed conversation that were vague and uncertain and failed to show mutuality to constitute an enforceable contract. It could not be determined from his answers whether he was promised the cent a pound for services he had already performed or for future services or both. He specified no obligation assumed by him. Apparently no time limitation was placed on the alleged contract and plaintiff could presumably collect commissions as long as defendant shipped powdered milk to Mexico, even though he was performing no services. That an experienced business man such as Hadrath was

should contract in this manner to his own detriment is simply incredible.

There are other cogent reasons supporting the view that no contract existed between the parties. Although over two million pounds of powdered milk was shipped to Mexico by defendant between the date of the alleged contract and the filing of this suit, not once did plaintiff mention the alleged contract or claim any commission on such shipments. He even admits that he would not be asserting it now except for other circumstances which caused him to bring this suit. The record is replete with instances where it would have been natural and reasonable to claim his commissions if he thought he was legally entitled to them. During one period between April and October, 1948, defendant rendered plaintiff monthly statements of his account which showed nothing owing him in respect to Mexican sales. Plaintiff never objected to these statements on that ground. His explanation that he was too busy and did not want to jeopardize his position with defendant is not impressive. His conduct clearly negatived the existence of any contract granting him commissions on Mexican sales. On the other hand, Hadrath positively denied making any such agreement and Stoltze, who was supposed to have approved it, was positive that he had never heard of it before this suit was filed. On the whole evidence it is not credible that the defendant contracted with plaintiff in the manner claimed to pay him commissions for the indefinite and possibly endless period for which it might export powdered milk to its Mexican distributor.

The judgment for $26,883.91 on the first count was against the clear weight of the evidence and must be reversed as being clearly erroneous under Rule 52 (a).

### Second Cause of Action.

The plaintiff's second cause of action alleged two claims against the defendant and the court awarded him recovery upon both. Judgment of $74,626.00, with interest, was awarded plaintiff on one claim and $49,923.34, with interest, on the other claim. We consider first the matter of the larger award.

It appears from the evidence that early in 1946 plaintiff obtained the gainful connection he was seeking with defendant when it decided to export powdered milk to Venezuela. The parties agreed that a Venezuelan corporation should be formed to handle the importing and distribution of defendant's product. Accordingly, Compania Anonima Distribuidora Valle Verde (hereafter referred to as Distribuidora) was organized. Defendant furnished all of the original capital, amounting to $6,000, and received 49% of the stock in the new corporation. Defendant later contributed over $6,000 additional capital. Plaintiff and one Casulleras, who owned the other 50% of the stock in Ultramar, were given 51% of the stock in Distribuidora upon the understanding that they would operate the corporation in Venezuela. There was no written contract between defendant and Distribuidora nor was it agreed that the latter would be the exclusive distributor of defendant's powdered milk in Venezuela. Distribuidora purchased the powdered milk from defendant at prices computed with reference to the cost of raw milk and sold it in Venezuela at a profit. During the period from September 1946 to April 1948, Distribuidora purchased in excess of 1,500,000 pounds of powdered milk from defendant. During this period the corporation was heavily indebted to defendant as it possessed very little capital and could not pay for its purchases until the powdered milk was resold. At one time it owed defendant about $500,000 but by 1948 this indebtedness had been reduced to approximately $75,000. In October, 1947, defendant sold all of its stock in Distribuidora to the other stockholders but continued to sell powdered milk to that company until April, 1948, when it contracted with Venezuela Basic Economy Corporation (hereafter referred to as V-BEC) to act as its distributor. At the time of contracting with V-BEC defendant orally

employed plaintiff on a commission basis to promote the sale of defendant's product in Venezuela. The employment continued until October, 1948, at which time plaintiff was discharged.

Regarding the claim upon which the court awarded plaintiff judgment of $74,-626.00, it was alleged in the second cause of action of the amended complaint that plaintiff,

> "conceived and developed the trade name Valle Verde for use and application to powdered milk to be sold in Spanish speaking countries and that this trade name was the property of the plaintiff and was registered for plaintiff in Venezuela by Ramon Casulleras in his name, acting on behalf of plaintiff and that said trade name was transferred to and became the property of C. A. Distribuidora Valle Verde, a Venezuela Corporation.

> "That between April 4, 1948, and May 30, 1948, plaintiff and defendant entered into an agreement by which plaintiff was engaged as defendant's special representative * * * to secure control of and transfer to defendant in Venezuela the registered trade name and good will of said trade name and to promote the sale and consumption of defendant's products in Venezuela.

> "That plaintiff * * * secured control of * * * trade name 'Valle Verde' and the good will of C. A. Distribuidora Valle Verde and caused the trade name * * * and the good will * * * to be transferred and assigned to defendant in Venezuela at a cost to plaintiff of more than $100,000."

It was not alleged that defendant agreed to reimburse plaintiff for the cost of such transfer or to pay him for such "special representative services", but it was alleged that defendant employed plaintiff as its agent for "so long as defendant continued to export to Venezuela" and that plaintiff was wrongfully discharged without just cause some six months later. Plaintiff claimed the amount expended in securing the transfer of the trade name and good will from Distribuidora to defendant should be restored to him as part of his damages for wrongful discharge. The court found that plaintiff secured the transfer at a cost of $74,626 and gave him judgment for that amount.

■ It is difficult to determine from the findings and conclusions filed in the court below whether the award of $74,-626 to plaintiff was based upon an implied agreement by defendant to reimburse plaintiff for his expenditure in securing the transfer of the trade name or whether this amount was held to be an element of the damages caused by the alleged wrongful discharge. We shall first consider whether there was an implied agreement that defendant would reimburse plaintiff the amount of his outlay in securing the transfer of the trade name.

When plaintiff left Caracas for Stillwater in September, 1945, he instructed his associate, Casulleras, to register the name "Valle Verde" in Venezuela. At that time plaintiff was neither a producer nor distributor of powdered milk. He admits he had never been even remotely connected with the manufacture and sale of this product. In the first conferences between plaintiff and officers of defendant company in Stillwater, plaintiff made many suggestions which he thought might be helpful in getting defendant's export program started, which in turn he hoped would prove beneficial to him. Among other things, plaintiff suggested defendant adopt "Valle Verde" as the trade name for its product exported to Spanish-speaking countries. Whether plaintiff informed defendant at this first meeting that he had instructed Casulleras to register "Valle Verde" in his own name in Venezuela is directly controverted by the testimony of the respective parties and is not a subject of the findings of the lower court. Within a few weeks plaintiff knew that defendant had decided to use "Valle Verde" as the trade name for its powdered milk exported to Spanish-speaking countries and

was spending large sums of money identifying its product with that name. In June, 1946, when plaintiff was again in Stillwater, a discussion arose concerning registration of the name in various countries where defendant's product might be exported. According to the law of some countries, including Venezuela, the name could not be registered until there had been a prior use in the United States, and this had not been accomplished since defendant had been unable to obtain the necessary containers for its product. Hadrath testified that plaintiff told him the name could be registered in Venezuela by Casulleras or by Distribuidora and should be done because some "unscrupulous person" might register it and it would have to be bought back. Apparently by this time plaintiff had learned that Casulleras had failed to register the name when so instructed in 1945, although in answer to a pretrial interrogatory plaintiff stated that he did not learn until 1949 that Casulleras had neglected to do so. At any rate, plaintiff sent the following cable to Casulleras: "Register trade name Valle Verde immediately Venezuela in name of Compania Distribuidora, if possible, or you personally if necessary in order to protect Maple Island effecting transfer later; rapidity important". Within a week Casulleras wrote defendant assuring it that the registration was made in his individual name because if registered under the "company's proper name", it would require "a special authorization be granted by the Board of Directors, and that will cause considerable delay." Thereafter, plaintiff repeatedly assured Hadrath and Stoltze that he was having the trade name transferred to defendant and that only the dilatoriness of Venezuelan officials was delaying said transfer. In October, 1947, defendant decided it did not wish to continue in the distribution end of the business in Venezuela and sold its 49% stock interest in Distribuidora to the other stockholders. At the time of the transfer of the stock certificates, Hadrath wrote plaintiff, "Mr. Stoltze * * *

insists that Valle Verde name be transferred to Maple Island Farm, Inc., at your convenience. Will you arrange to have this done when you can?", whereupon plaintiff replied, "I will take care of the transfer of the name in your letter." Within a month thereafter, Casulleras transferred the trade name to Distribuidora, no part of which was now owned by defendant. Plaintiff, as president of Distribuidora, accepted the transfer on behalf of the corporation. From October, 1947, until April, 1948, plaintiff neglected to tell defendant that the trade name was not being transferred to defendant. In April, 1948, defendant contracted with V-BEC to act as distributor for its powdered milk in Venezuela and employed plaintiff on a commission basis to promote the sale of its product there. It was at this time that plaintiff informed defendant that the stockholders of Distribuidora, of which he now owned about 30% of the stock, were claiming ownership of the trade name and were demanding money for its transfer. Hadrath, with justifiable indignation, told plaintiff that defendant had always owned the trade name and would never pay a dime to buy something which it already owned. He immediately placed a stop order on all shipments of powdered milk in transit to Venezuela. In that situation, plaintiff assured defendant that he would "assume the responsibility" of getting his "partners in Venezuela" to consent to transfer the trade name to defendant. He did not ask for any direction or authority from defendant but acted entirely for himself. It was plain to him from defendant's declaration and action that he would, as he testified, "have to do something" to save his job with defendant. He recognized that his employment was conditioned upon relieving the defendant of the false claim asserted against it. V-BEC was producing large orders for powdered milk (1,300,000 pounds within 40 days on which plaintiff's commissions would be about $39,000) and it was apparent that plaintiff's employment was going to be very remunerative. He therefore requested defendant to let him

personally assume $50,000 of the debt which Distribuidora owed to defendant, hoping that in this manner the other stockholders would consent to liquidation of Distribuidora and the trade name could be transferred to defendant. Defendant agreed to plaintiff's request to assume $50,000 of Distribuidora's debt and plaintiff thereupon effected the liquidation and transfer. What occurred is graphically illustrated in a letter which plaintiff wrote Hadrath on July 29, 1948, as follows:

"* * * Incidentally, now that Distribuidora Valle Verde has been completely liquidated I thought you would like to know what it cost me to bring the matter to a conclusion. Ramon Casulleras and Enrique Claverol received Bs. 100,000 each and Ramon Matos Bs. 50,000. A total of Bs. 250,000 or $74,626."

"This is a bigger step and a bigger bite than I expected. However, as you are well aware, the situation was a very trying one for me and in the last few months I went thru a hell of a lot of mental anguish. It had become so much of a mental strain that I was glad to get it over at all costs to be able to forget it once and for all. I feel, or at least hope, that you realized my position."

Plaintiff was discharged in October, 1948, for reasons which will be discussed hereinafter.

The evidence presented above clearly establishes that there was no implied agreement on the part of defendant to reimburse plaintiff for his expenditure in obtaining the transfer of the trade name. Plaintiff's surrender to the demands of the other stockholders of Distribuidora was voluntary and was not induced by any words, acts, or conduct, express or implied, on the part of defendant. Defendant firmly maintained that it was the legal owner of said trade name and never consented to pay a cent for its transfer. Plaintiff's self-interest in maintaining his employment with defendant was the motivating force behind his surrender and payment of $74,626 to the other stockholders of Distribuidora for the transfer of the trade name.

We now turn to the question of whether the award of $74,626 to plaintiff was proper as an element of damage for the alleged wrongful breach of his employment contract by defendant. Since there was in fact no agreement that defendant would reimburse plaintiff for his expenditure in obtaining the trade name, it follows that the judgment cannot stand unless such an agreement can be implied in law. In other words, defendant had no duty to repay this sum unless justice or good conscience requires it, or unless defendant has been unjustly enriched at plaintiff's expense. But a person cannot claim reimbursement or restitution where he voluntarily pays out money on his own account in his own interest, without request, authorization, or consent of the party from whom he seeks to recover it. In regard to this question of unjust enrichment, the Supreme Court of North Dakota in Minneapolis, St. Paul & Sault Ste. Marie Railway Co. v. Washburn Lignite Coal Co., 40 N.D. 69, 168 N.W. 684, 686, 12 A.L.R. 744, has this to say:

"Where there is no contract in fact, either implied or express, the law will not imply one except to support a recovery in favor of a plaintiff on the principle that the defendant has been unjustly enriched at his expense. While authorities in point are singularly lacking, the controlling principle is clearly the same as in case of mistake, and it is elementary that, where the defendant is free from responsibility for plaintiff's mistake, or is responsible in no greater degree than the plaintiff, and where his position is such that the enforcement of restitution would subject him to loss the defendant is entitled to retain whatever benefit he has derived from the mistake. Woodward on the Law of Quasi Contracts, § 20."

We think this statement peculiarly applicable in the present case. The simple truth is that plaintiff paid out the money

on his own initiative and we know of no rule of law, innate sense of justice, or dictate of conscience requiring defendant to reimburse him.

The award of $74,626 to plaintiff for effecting the transfer of the trade name was clearly erroneous and must be reversed. Kasper v. Baron, supra; Aetna Life Ins. Co. v. Kepler, supra.

In respect to the other claim stated in plaintiff's second cause of action, and upon which the court awarded him judgment in the amount of $49,922.34 and interest, it was alleged that, in addition to securing control of the trade name, defendant employed plaintiff,

"to promote the sale and consumption of defendant's products in Venezuela" and "for all of plaintiff's services as aforesaid * * * defendant agreed to pay the plaintiff a commission based on exports to Venezuela each year so long as defendant continued to export into Venezuela, on the following scale: two cents (2¢) per pound on the first two million pounds, one and three-fourth (1¾¢) per pound on the third million pounds, one and one-half (1½¢) per pound on the fourth million pounds and one and one-fourth cents (1¼¢) per pound on the fifth million pounds and one cent (1¢) per pound on all shipments each year in excess of five million pounds, and providing further that plaintiff was to receive during 1948 only, a commission of three cents (3¢) per pound on the first one million three hundred thousand pounds of milk sold."

"That on * * * October 30, 1948, * * * the defendant, without cause or justification attempted and purported to cancel and terminate its contract with plaintiff * * *"

" * * * by reason of defendant's breach of contract with plaintiff the plaintiff has been damaged in the sum of $750,000."

Defendant in its amended answer admitted employing the plaintiff on the basis of the commissions alleged in the second cause of action of plaintiff's amended complaint but denied that the employment was to continue "so long as defendant continued to export into Venezuela". It alleged that the agreement was terminable at the will of either party and that plaintiff,

"failed to devote his full time or best efforts to the promotion of the sale of defendant's milk powder in Venezuela, but on the contrary devoted a large part of his time to other pursuits in furtherance of his own personal interests * * * occasioning long and unjustified absences of plaintiff from the field of his work and employment * * *; that he so acted as to incur the ill will of customers and prospective customers for defendant's milk powder * * *; that in his relations with defendant * * * plaintiff was in certain particulars lacking probity; that plaintiff's breaches of duty * * * constituted a just cause for his discharge * * * regardless of the terms of his employment agreement as to duration."

The trial court, in its conclusions of law on the second cause of action, declared,

"2. A valid and enforceable contract between the plaintiff and the defendant was made between April 2 and October 30, 1948, * * *."

"4. The said contract * * * was not terminable at will by the defendant."

The plaintiff was thereupon awarded judgment for $49,922.34 and interest.

Defendant contends that plaintiff's employment was terminable at will because: (1) Contracts for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no independent consideration, amount to an indefinite general hiring terminable at the will of either party; (2) Hadrath did not have authority to employ plaintiff for the term alleged; (3) there was

no mutuality of obligation because plaintiff's services were undefined and he was free to quit at any time; (4) Hadrath in fact never agreed to such a term of employment. Defendant also contends (5) plaintiff's discharge was justified regardless of the term of employment.

Examination of the record convinces us that defendant's contentions are well taken and that the judgment for $49,-922.34 is so clearly erroneous as to require reversal.

(1) It is plain that plaintiff's alleged employment contract with defendant for "so long as defendant continued to export into Venezuela" would amount to a contract for practically permanent employment or life employment. Plaintiff contends, however, that in securing the transfer of the trade name to defendant, he was furnishing additional and independent consideration for his employment contract with defendant. But as we have pointed out, plaintiff secured the transfer of the trade name in order to "save his job with defendant". That service was a condition of, and not consideration for, his employment contract. Under such circumstances the rule is well settled that the employment is indefinite and terminable at will. For a recent case reviewing some of the authorities on this point, see Edwards v. Kentucky Utilities Co., 286 Ky. 341, 150 S.W.2d 916, 917, 135 A.L.R. 642, where the court said,

> "A universally recognized rule of law is that a contract for permanent employment which is not supported by any consideration other than the obligation of services to be performed on the one hand and wages to be paid on the other is a contract for an indefinite period, and, as such, is terminable at the will of either party."

In Skagerberg v. Blandin Paper Co., 1936, 197 Minn. 291, 266 N.W. 872, it was also held that a contract for permanent employment is terminable at will. Of course there can be no damages for breach thereof where the contract is terminable at will.

(2) Although Hadrath was the general manager of defendant, Stoltze testified without dispute that as president of the corporation it was his duty to direct its operations, lay down its policy, and to make all important decisions. He was deferred to by Hadrath as the "boss" and plaintiff well knew that Hadrath's powers were limited. There are many instances in the record, relatively unimportant compared to the making of a contract such as was alleged, where Hadrath was required to obtain Stoltze's approval before proceeding. There is no claim that Stoltze ever authorized or approved such a contract as plaintiff claimed. As general manager, Hadrath had authority to conduct and manage the corporation's ordinary day to day affairs and to hire agents to carry on its work. But he did not have, or appear to have, authority to employ anyone for life or for so long as it continued to carry on business in general, or in an important field such as Venezuela. Nor was there any evidence that Hadrath ever held himself out as having such authority. Having no such authority in fact, it may not be imputed to him as a matter of law. In Eggers v. Armour & Co., 8 Cir., 129 F.2d 729, 732, this court declared:

> "The rule is that a general manager of a business with authority to employ is not presumed to have authority to make contracts for lifetime employment. F. S. Royster Guano Co. v. Hall, 4 Cir., 68 F.2d 533, 536; Reupke v. D. H. Stuhr & Son Grain Co., 126 Iowa 632, 102 N. W. 509; Ney v. Eastern Iowa Telephone Co., 162 Iowa 525, 144 N.W. 383; General Paint Corp. v. Kramer, 10 Cir., 57 F.2d 698; Rennie v. Mutual Life Ins. Co., 1 Cir., 176 F. 202."

Laird v. Michigan Lubricator Co., 153 Mich. 52, 116 N.W. 534, 17 L.R.A.,N.S., 177; Standard Textile Products Co. v. Pertchi, 1936, 23 Ohio Law Abst. 70; 28 A.L.R.2d 934.

(3) Plaintiff did not allege in his complaint nor offer proof of any promise or obligation to serve defendant.

as its agent in Venezuela for a specified term. His employment to "promote sales and consumption" outlined no specific duties and was vague and uncertain. See Silbernagel v. Hirsch Distilling Co., 8 Cir., 99 F.2d 829, where this court held that a contract to "push" whiskey sales was vague and uncertain and unenforceable. Plaintiff retained his right to quit his employment at any time. His contract so far as it remained executory was terminable at will. Defendant became liable to plaintiff for all commissions accruing during the period the contract was performed but insofar as the contract remained executory it was not binding. Where the consideration is a promise for a promise but the promise of one party to the agreement is vague and uncertain and the contract can be cancelled at any time, the contract is unenforceable and is terminable at will. E. I. Du Pont de Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 89 A.L.R. 238; Rutland Marble Co. v. Ripley, 10 Wall. 339, 19 L.Ed. 955; Willard, Sutherland & Co. v. U. S., 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086; Velie Motor Car Co. v. Kopmeier Motor Car Co., 7 Cir., 194 F. 324, 114 C.C.A. 284; McCaffrey v. B. B. & R. Knight, Inc., D.C., 282 F. 334; Fowler Utilities Co. v. Gray, 168 Ind. 1, 79 N.E. 897, 7 L.R.A.,N.S., 726, 120 Am.St.Rep. 344; 6 R.C.L. 691; 1 Williston, pp. 219, 222.

■ (4) Examination of the record has led to the firm conviction that in truth and in fact Hadrath did not employ the plaintiff for "so long as defendant continued to export to Venezuela." The written opinion of the trial court indicates that it was not persuaded that Hadrath had done so. In the opinion, the court noted the flat contradiction between plaintiff's claim to having made such an agreement and Hadrath's positive oath to the contrary, and said in respect to it: "Fortunately, it is unnecessary to borrow trouble by deciding this dispute." However, in the findings prepared by counsel and signed by the court on the same day it is found that, "De-fendant agreed to pay to plaintiff a commission based on exports into Venezuela each year so long as defendant continued to export into Venezuela * * *." But the record is clear that defendant had a fixed policy never to grant employment for such a length of time. The contract suggested by plaintiff at the first meeting of the parties, which would have lasted for a period of 10 years, was rejected for the reason (among others) that the period of duration was too long. The agreement under which defendant's product was sold to Distribuidora was not for a specified period and was admittedly terminable at will. No written word supports plaintiff's testimony that the contract of employment was to endure for such a period, and there is no claim that such a duration was ever again referred to in any of the voluminous correspondence or innumerable conferences between the parties, or heard of by anyone prior to this suit. Plaintiff received and read the original complaint in this action. It contained no such claim as to the duration of his employment. The claimed duration was an after-thought brought into the action by amendment to the complaint. In his response to a pre-trial interrogatory, which plaintiff took months to prepare, he said that defendant engaged him on the terms set out in the complaint—meaning the original complaint containing no such claim of duration. Plaintiff's version as to when and with what expressions Hadrath agreed to the alleged duration of employment was radically different in his responses to pre-trial interrogatories and in his testimony on the trial. Mere comparison of his several versions reflects at least inaccuracy of recollection on this vitally important point. The witness Carlos Del Mercado, who was closely associated with plaintiff, testified that plaintiff told him the day after he was employed by Hadrath in April, 1948, that his arrangement with defendant was of indefinite duration. The plaintiff admitted that he did at that time tell Del Mercado about his agreement made with Hadrath and discussed it with him, but

there appears no denial by him of Del Mercado's statement.

Since the contract was terminable at will by either party and no liability attached for such termination, it would be unnecessary to consider whether defendant had just cause for discharging plaintiff. However, in view of the fact that it may seem plaintiff was unjustly treated in being summarily discharged after only a few months service, we refer briefly to the circumstances under which the termination was effected.

(5) In April, 1948, when plaintiff was employed to "promote the sale and consumption" of defendant's product in Venezuela, he agreed to devote his full time and best efforts to this work and to divorce himself from his numerous other activities. During the period of about seven months he was employed by defendant, he absented himself from Venezuela and was in the United States for about three months. Although part of this time spent in the United States was apparently used in promoting the sale of defendant's product, it is equally apparent from the record that much of it was not. There is convincing documentary evidence showing that during the entire seven month period plaintiff did not give up his other activities, but on the contrary endeavored to promote further business ventures in his own behalf.

One incident related in the record was of itself sufficient to warrant plaintiff's discharge. A milk powder reconstituting machine belonging to the defendant, which was called the "Milkmade", was shown to plaintiff when he was in Stillwater in 1947. Plaintiff conceived the idea that there would be very large profits in handling these machines, estimating that the profits would run as high as $50,000 a year. He purchased two of these machines and took them back to Venezuela with him. There he employed a draftsman, had drawings made of the machine, and applied for a patent on it in Venezuela in his own name, reciting in the application that he was the inventor and had invented the machine after much study. The patent was issued in his name. He never informed defendant that he applied for and patented the machine in his own name but gave defendant to understand that he was protecting and making secure the defendant's rights in the machine in Venezuela.

The importance of plaintiff's conduct in respect to defendant's "Milkmade" machine appears when it is considered in connection with his conduct in respect to the Valle Verde trade name transaction. Defendant was lulled by plaintiff's conduct and representations into confident belief that plaintiff was acting to safely secure defendant's ownership in the trade name in Venezuela. Later, defendant was confronted with claims and demands for large sums of money from plaintiff's associates and later plaintiff himself, on the grounds that they owned the trade name and defendant could not do business in Venezuela without it. In like manner, plaintiff assured defendant that he was securing the patent rights for defendant in Venezuela on the "Milkmade" machine while at the same time he was asserting in the Venezuelan patent office that he himself was the inventor of said machine. That he, as agent, violated his duty of loyalty, fair dealing and full disclosure to his principal appears too plain for argument or discussion. The rule in Minnesota, as elsewhere, is clear that the utmost fidelity is required of an agent in his relations with his principal. National Pole & Treating Co. v. Gilkey, 182 Minn. 21, 233 N.W. 810. Plaintiff's conduct was ample justification for his discharge by defendant.

We therefore conclude as to the second cause of action that the contract of employment was terminable at will, and even had it not been, plaintiff's discharge was warranted under the circumstances. It seemed to the trial court that plaintiff had been harshly treated and not fairly compensated by the defendant. But it appears that even before he left his employment with the Corporacion Americana defendant gave him a check for $5,000. In the summer of 1946, defendant gave him over one-fourth interest in Dis-

tribuidora. Within a year the book value of that interest had risen to about $15,000, and he had received a substantial salary and travel expenses from the corporation. He received additional salary and expenses in 1947. In 1948, in the relatively short time he was employed by defendant, he earned and was credited with $55,000 in commissions. There could be no fair inference that defendant did not adequately compensate him for the services he rendered. Any harsh treatment he may have received rests solely on the fact that he chose to give up all of his interest above some $6,000 in Distribuidora and his commission earnings to those with whom he associated himself in Venezuela in order, as he stated in his letter, supra, to "get over" the mental anguish and strain caused him by claims they asserted in respect to the trade name. As we have pointed out, this surrender of his interest and earnings to his associates was of his own volition and not at defendant's instance or request.

The ruling of the trial court that the contract was not terminable at will and, inferentially, that Hadrath had authority to employ plaintiff for "so long as defendant should export to Venezuela" were errors of law requiring reversal. In sustaining defendant's other contentions we follow Rule 52(a), as construed by the Supreme Court in U. S. v. United States Gypsum Co., 333 U.S. 364, 68 S. Ct. 525, 92 L.Ed. 746, and declare our firm conviction that a mistake has been committed in finding that the duration of the contract was to be as alleged by plaintiff. We are also convinced that plaintiff's action concerning the "Milkmade" machine, considered with his action in respect to the trade name, was just cause for his discharge.

All of the numerous contentions argued have been considered but the judgment is reversed and the case is remanded with directions to dismiss at plaintiff's costs on the grounds herein set forth.

Reversed and remanded with directions to dismiss.