Opinion issued March 11, 2010

 

                                                                        

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-09-00164-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



Charlotte Doyle, as Executor
of The Estate of AlFred Miller, Deceased, Appellant

 

V.

 

Leticia G. Heilman, Appellee

 

 



On Appeal from Probate Court No. 1

 Of Harris County,
Texas

Trial Court Cause No. 375,221-401 

 

 



MEMORANDUM OPINION

          Following
a bench trial, the court awarded appellee, Leticia G. Heilman, $72,300 in
damages on her claim for quantum meruit against Charlotte Doyle, as executor of
the estate of Alfred Miller.  The court
also awarded $16,177.50 in attorney’s fees and additional amounts in the event
of an appeal.

          On
appeal, Doyle contends that the trial court erred by (1) failing to apply Texas
Probate Code Section 59A, the statute of frauds, statute of limitations, and
laches; (2) applying the equitable principle of quantum meruit to allow for a
recovery barred by Probate Code Section 59A; (3) finding the evidence to be
legally and factually sufficient to support Heilman’s claim for quantum meruit;
(4) awarding damages not supported by the evidence; (5) overruling Doyle’s Daubert challenge to the qualifications
of Heilman’s expert; and (6) awarding legal fees.

          Because
we find that Heilman failed to establish a claim for quantum meruit as a matter
of law, we sustain Doyle’s third issue and need not address the others.  We reverse the judgment of the trial court
and render judgment that Heilman take nothing.

Background

Albert Miller died on December 14,
2006, survived by his step-daughter, Charlotte Doyle.  Miller left a valid, unrevoked, written will
bearing his signature signed August 4, 2001. 
The will left all of his property to his step-daughter, Doyle, and his
daughter, Sharon M. Bellamy, who predeceased him in 2004.  The will was admitted for probate on October
16, 2007.  The court appointed Doyle as
independent executrix of the estate, pursuant to the terms of the will.  Doyle filed an inventory of Miller’s property
with the court on December 6, 2007, accounting for a total estate value of
$93,108.97 and no outstanding claims.  

On December 17, 2007, Leticia G.
Heilman filed an unsecured claim against the estate for “the total amount of
the net worth of the entire estate; and alternatively, the value of the personal
services performed by Claimant in the approximate sum of $90,000.00.”  The claim further alleged that Heilman had an
oral contract with Miller agreeing that Miller would give “all his worldly
goods of value” to Heilman if she cared for his needs until he died.  Heilman swore in her claim that she cared for
Miller for “over six (6) years, working on average from six (6) to ten (10)
hours per day, seven days per week, without compensation.”[1]  

Doyle, as executor of Miller’s
estate, rejected the claim on January 14, 2008, and this suit followed.  On March 13, 2008, Heilman filed her original
petition with the probate court alleging breach of contract, promissory
estoppel, quantum meruit, breach of fiduciary duty, spousal liability, and
unjust enrichment.  The court granted
summary judgment in favor of Doyle, disposing of all of Heilman’s claims with
the exception of quantum meruit.

Heilman proceeded to trial on a claim
for quantum meruit, alleging that she orally agreed with Miller in 2002 that he
would leave her “all his worldly possessions” upon his death.  Her fifth amended petition alleges that
Miller “knew or should have known that [Heilman] expected compensation” because
he “had reasonable notice that [Heilman] expected compensation when [Miller]
accepted the services.”  Specifically,
she alleged that Miller “knew that [she] would have to forego other employment
opportunities in order to provide the services contemplated.” 

At trial, Heilman testified that she
met Miller in about November 2000 in the parking lot of Kroger’s grocery
store.  Heilman testified that Miller was
lost and she helped him to get home. 
Heilman testified that they talked for a few minutes outside of his home
and they exchanged phone numbers. 
Heilman said that Miller called her later that day when he was lost
again.  Heilman testified that she saw
Miller every day after that.  Right after
meeting him, they began calling each other on the phone, and Heilman would go
with Miller to his doctor appointments.  Heilman
testified that she began caring for Miller as his caregiver in January
2001.  Heilman testified that she would
go to Miller’s house every morning around 8 a.m. and would leave around 1
p.m.  She testified that several times a
week, Miller would call her to come back to his house later in the
evening.  Heilman said that she developed
a “bond” with Miller, and there was “true affection” between them.  She testified that she “loved Mr. Miller.”  Robert Mendel, Miller’s best friend,
testified that Miller was very happy with Heilman, explaining “she gave him
love, she gave him—she gave him what he didn’t have and he was very
happy[.]”  

Miller’s health deteriorated over the
course of the relationship.  Heilman
testified that, in the last year of his life, Miller had to wear diapers and
had accidents due to his stomach cancer. 
Towards the end, Miller would sometimes need help in the middle of the
night, but Heilman testified that her love for Miller “made it all a little bit
easier” to care for him. 

She testified that she continuously
cared for Miller over six years by preparing breakfast and lunch, grocery
shopping with him, cleaning, doing laundry, taking him to doctor appointments,
and going with him to visit friends and family. 
Heilman also assisted him in paying his bills: in the beginning of the
relationship, he would write the checks, but later, he would give her money and
she would pay the utility bills at the grocery store.  Heilman testified that Miller would also write
her checks to buy groceries.  Miller was
able to drive and operate a motor vehicle, up until his stroke shortly before
his death.  The stroke caused vision
problems that left him unable to drive.  It
was undisputed that Miller was of sound mind and had control of his faculties
up until the time of his death. 

Heilman testified at trial that she
had not been employed since 1994.  Heilman
said she was never paid by Miller for her services.  Heilman testified that, during the time that
she knew Miller, he never offered to pay her for her help.  She also testified that she never asked
Miller to compensate her.  When
questioned by her attorney on direct examination regarding why she was never
paid, she testified, “In 2001 he told me he wanted to never go to a nursing
home.”  Heilman’s testimony regarding the
oral agreement consisted of the following exchanges:

[Heilman’s
attorney]: So you say he told you
he wanted you to have everything, what was the condition that you would get
everything?

 

[Heilman]:        For me to continue to help him and care
for him.

 

 . .
.

 

[Heilman’s
attorney]: Okay.  Now, with regard to your compensation, did
that subject come up often?

 

[Heilman]:        Yes.

 

[Heilman’s
attorney]: And did he always say
the same thing?

 

[Heilman]:        Yes, he did.

 

[Heilman’s
attorney]: And that was again?  What would he say?

 

[Heilman]:        He said you are the only one that really
cares about me and everything that I have will go to you.

 

[Heilman’s
attorney]: And did he inform you of
his assets, what he owned?

 

[Heilman]:        No.

 

[Heilman’s
attorney]: Well, you knew he owned
the house, right?

 

[Heilman]:        Yes.

 

[Heilman’s
attorney]: And you didn’t know
about anything else that he had?

 

[Heilman]:        No.

 

Both Heilman’s original unsecured
claim filed with the estate and her original petition allege that she cared for
Miller for six years or longer and requested compensation for that service
beginning in 2000.  However, her
allegations changed throughout the pendency of the case.  In her fifth amended petition, she claimed she
was owed compensation for her services beginning in August 2001, despite the factual
claim in the same petition that she entered into an oral agreement with Miller
in early 2002.  In her affidavit filed as
summary judgment proof, Heilman stated under oath the oral agreement occurred
in early 2002.  In a response to an
interrogatory, Heilman claimed the oral agreement occurred in March 2002.  But, during trial, she testified that it was
actually in 2001.  At trial when she was
asked about the “agreement that [she] made with [Miller] in March of 2002,” she
continuously corrected trial counsel that it was actually 2001.  Thus, Heilman’s trial testimony was that the
oral agreement to leave Heilman “all of his worldly possessions” occurred in
March 2001.  Miller, however, had a valid
will signed August 4, 2001, leaving all of his property to his daughters and
making no mention of Heilman.

Heilman called Robert Mendel, who testified
that he was Miller’s best friend. 
Heilman testified Mendel could corroborate her testimony regarding the
oral agreement with Miller.  The record,
however, reveals the following testimony from Mendel:

[DOYLE’S ATTORNEY]:      [W]hat
was your understanding of the agreement Mr. Miller made with Ellie, Mrs.
Heilman, to pay for her services?

 

[MENDEL]:                   I
don’t know that.

 

[DOYLE’S ATTORNEY]:      You
don’t know of any agreement?

 

[MENDEL]:                   No.

 

[DOYLE’S ATTORNEY]:      Was
it your understanding he said something to you about leaving his entire estate
to Mrs. Heilman?

 

[MENDEL]:                   He
did make that remark, yes, sir.

 

Mendel testified that Miller “[n]ever
discussed finances” so he was unaware of any annuities or assisted care
insurance that Miller bought. 
Additionally, Mendel testified that Miller never told him he already had
a will.  

Heilman admitted she had no
documentation of her agreement with Miller. 
She also admitted that she never counted or documented the time she
spent caring for Miller.  She claims if
she had charged an hourly wage for her services, she would have charged about
$12 an hour.  Heilman admitted she had no
special training beyond a high school diploma and was not certified or licensed
in any profession.  

Heilman testified that she knew
Miller already had a will and that, on the day Miller passed away, they had
made plans to go before a notary for Miller to make a new will.  Heilman admitted that she was the only person
who spoke with the notary, and Miller did not. 
Heilman said that Mendel was planning to meet them that day to witness
the signing.  When Heilman realized
Miller had died, she called Mendel but did not call his step-daughter, Doyle.  Heilman admitted that she had Doyle’s
number.  Heilman testified that Miller
had been talking about going to get a new will for about a year prior to his
death. 

Heilman initially alleged she never
received any type of compensation or anything of value from Miller.  Later, Heilman admitted that she received two
automobiles from Miller but insisted she paid $2,000 in cash for one of the automobiles.  She said she had no record to support that
she paid for the vehicle.  Tax and title
forms signed by both Miller and Heilman showed both vehicles as gifts.  Additionally, the form for the vehicle
Heilman claimed she purchased from Miller listed the price paid for the vehicle
as $0.  The second vehicle, a 2002
Blazer, was transferred to her by Miller in April of 2006 after Miller had a
stroke and was unable to drive.  

Heilman testified that, after
Miller’s death, she went back to his house “[t]o pick up [her] things that
[she] had there.”  Heilman testified that
Miller had saw sharpening and welding equipment that ended up in the possession
of Mr. Mendel’s brother-in-law.  She said
she was unaware whether Miller was paid for the property.

Heilman presented an expert witness,
Mr. Shelby Clark, to testify to the value of her services.  Clark’s curriculum vitae showed a bachelor’s
degree in Architecture from the Rhode Island School of Design and an MBA from
the University of Texas.  Clark had
experience in the building and telecommunications industries.  Clark’s experience with the caregiving field
started in December 2004 when he became the manager of Comfort Keepers.  Clark said he “guessed” as to the value of
Heilman’s services based on the amount of time she reported to him, which she
admitted she never recorded.  Clark’s
figure was based on services beginning in 2000. 


Doyle presented an expert, Toni
Oville, that said the industry standard in the caregiving industry was to keep
records of your time.  Because Heilman
did not keep records of her time, Oville’s opinion was that there was no way to
determine the correct amount to compensate her. 


Doyle testified at trial that
throughout her life she referred to Miller as “[D]addy” and he referred to her
as his “daughter,” even though she was his step-daughter.  Doyle testified that Miller spoke of Heilman
often, but never stated that he intended to leave everything to her.  Miller also never told Doyle that he intended
to leave his estate to Heilman in exchange for services she rendered.  Doyle testified that Heilman brought Miller
over to her house several times and she also saw the two together grocery
shopping.  Doyle said that she did not
have a bad relationship with Heilman. 
Heilman spoke with Doyle on several occasions but never informed Doyle
that she was seeking compensation for her services.  The first time Doyle became aware of
Heilman’s claim was when she filed the claim against the estate.

Doyle testified that she found out
about her father’s death from a message Mendel left on her voicemail.  When Doyle arrived at Miller’s home on the
day of his death, Mendel and Heilman informed her that her father wanted
Heilman to have everything.  They also
mentioned that Miller wanted Heilman to have an annuity, despite Miller’s
designation of Doyle as the beneficiary. 
Doyle testified that Miller had the ability to change the beneficiary
but never did.  Additionally, Doyle
testified that her father had insurance to pay for care if something happened
to him and he was unable to care for himself. 
Doyle testified that after her mother (Miller’s wife) was placed in a nursing
home and Miller realized the expense involved, Miller met with an insurance
agent to restructure his finances to make sure he was secure and his estate
would not be depleted.  Miller purchased
two prepaid annuities and an insurance policy for himself covering assisted
living and nursing home expenses.  

The evidence presented at trial
revealed that Miller owned his home, free and clear, and had an annuity which
paid $1,000 per month.  Heilman testified
that this money was used to pay for groceries and bills, but eventually ran
out, at which point she called Doyle. 
Heilman told Doyle that Miller received a letter saying “he was not
going to get the money anymore.”  Doyle
informed Heilman that if Miller was uncomfortable not having that money that
Heilman could take him to the bank to withdraw $1,000 a month.  Heilman testified that she would take Miller
to the bank to cash his $1,000 check or withdraw money.  There were no records presented at trial
showing how Miller’s money was spent each month. 

After a bench trial, the trial court
entered a judgment in favor of Heilman on her claim for quantum meruit,
awarding $72,300 in damages and $16,177.50 in attorney’s fees.

Discussion

On appeal, Doyle contends that Section
59A of the Texas Probate Code is an absolute bar on Heilman’s recovery.  Specifically, Doyle asserts that Section 59A
bars recovery for quantum meruit.

Section 59A provides: “A contract to
make a will or devise . . . can be established only by: (1) provisions of a
written agreement that is binding and enforceable; or (2) provisions of a will
stating that a contract does exist and stating the material provisions of the
contract.”  Tex. Prob. Code Ann. § 59A (Vernon 2003).  Heilman admits she has no written agreement
and she is not named in Miller’s will, so it is clear she cannot meet this
standard to establish the existence of a contract.  However, Heilman argued that she should
recover under quantum meruit for the reasonable value of her services, and the
trial court entered judgment in her favor.

Quantum meruit is an equitable remedy
that does not arise out of a contract, but is independent of it.  Vortt
Exploration Co. v. Chevron U.S.A., Inc., 787 S.W.2d 942, 944 (Tex. 1990).  Generally, a party may recover under quantum
meruit only when there is no valid express contract covering the services or
materials furnished.  Id.; see
also Woodard v. Sw. States, Inc., 384 S.W.2d 674, 675 (Tex. 1964) (“Where
there exists a valid express contract covering the subject matter, there can be
no implied contract.”).  The San Antonio
Court of Appeals addressed a claim for unjust enrichment and a Section 59A
defense but did not reach the issue because the claimant sought a recovery
based on a contract, which Section 59A precludes if it is not in writing.  See In
re Estate of Wallace, No. 04-05-00567-CV, 2006 WL 3611277 (Tex. App.—San Antonio
2006, no pet.) (mem. op.).  We find no
authority establishing that a claimant can recover on a claim for quantum
meruit for an alleged oral agreement that is barred by Section 59A.  We too need not decide whether Section 59A bars
a quantum meruit claim; even if we assume recovery under quantum meruit is
permissible against the estate of a decedent who received services, Heilman
cannot recover as a matter of law.

Quantum meruit is an equitable theory
of recovery founded in the principle of unjust enrichment.  Vortt
Exploration Co. v. Chevron U.S.A., Inc., 787 S.W.2d 942, 944 (Tex. 1990).  “To recover under the doctrine of quantum
meruit, a plaintiff must establish that: 1) valuable services and/or materials
were furnished, 2) to the party sought to be charged, 3) which were accepted by
the party sought to be charged, and 4) under such circumstances as reasonably
notified the recipient that the plaintiff, in performing, expected to be paid
by the recipient.”   Heldenfels Bros. v. City of Corpus Christi, 832 S.W.2d 39, 41 (Tex.
1992); Vortt Exploration Co., 787
S.W.2d at 944; Speck v. First Evangelical
Lutheran Church of Houston, 235 S.W.3d 811, 815 (Tex. App.—Houston [1st
Dist.] 2007, no pet.).

Doyle argues that Heilman failed to
satisfy her burden of establishing the elements of quantum meruit.  Specifically, Doyle argues that the evidence
is legally and factually insufficient to establish that Heilman’s services were
rendered under circumstances that reasonably notified Miller that she expected
to be paid. 

In addressing a similar issue, the
Corpus Christi Court of Appeals held that evidence of a decedent’s stated
desire that he wished to compensate caregivers by remembering them in his will
was no evidence that decedent was “reasonably notified” that the caregivers
expected him to compensate them for caring for him during his last years.  Herbst
v. Sheppard, 995 S.W.2d 310, 315 (Tex. App.—Corpus Christi 1999, pet.
denied).  Without evidence that the
decedent was aware that the caregivers “expected” compensation for their
services, they cannot recover in quantum meruit.  Id. (citing
Heldenfels Bros., 832 S.W.2d at 41).

In the present case, Heilman unequivocally
testified that Miller never offered to pay her for her services and she never
asked Miller to compensate her.  Heilman
testified that they had a relationship based on mutual affection and she loved
Miller.  While Heilman’s testimony is
inconsistent as to the exact date she made an oral agreement with Miller, in
all the factual variations it is clear that she was caring for Miller on a
daily basis before there was an alleged oral agreement.  Even if taken as true, Heilman’s testimony shows
that at some point after voluntarily
caring for Miller on a daily basis, Miller said he would provide for Heilman in
his will.  Her testimony provides no
evidence that she relied on the statement to her detriment.  Rather, her testimony is that she continued
caring for Miller, as she had been doing voluntarily.  Because she cared for Miller for months
without compensation before Miller mentioned including her in his will, the
circumstances could not have reasonably notified Miller she sought compensation.  She admitted that she never asked Miller for
compensation.  While she claims in her
live petition that Miller had reasonable notice that she expected to be
compensated because he “knew that [she] would have to forego other employment
opportunities in order to provide the services contemplated,” Heilman testified
at trial that she was a “housewife” and had not been employed since 1994.  Thus, there is no evidence that Heilman
relied on Miller’s statement and forewent other job opportunities; because she
did not change her position, the circumstances could not have put Miller on
reasonable notice that she expected to be compensated.  See Herbst,
995 S.W.2d at 315.  “A person who has
conferred a benefit upon another, manifesting that he does not expect
compensation therefor, is not entitled to restitution merely because his
expectation that the other will make a gift to him or enter into a contract
with him is not realized.”  Peko Oil USA v. Evans, 800 S.W.2d 572,
577 (Tex. App.—Dallas 1990, writ denied) (quoting Restatement Of Restitution § 57 (1937)).  “It is elementary in the law governing
quantum meruit recovery for work and labor that no recovery may be had for
services performed, without thought of direct cash compensation[.]” Id. (citing Maple Island Farm v. Bitterling, 209 F.2d 867, 871-72 (8th
Cir.1954)).  

Further, Mendel does not corroborate
Heilman’s testimony regarding an agreement. 
To the contrary, Mendel testified he was unaware of any agreement between
Miller and Heilman to compensate Heilman for her services.  Mendel’s only corroborating testimony was that
Miller had mentioned including Heilman in his will.

Accordingly, we hold that Heilman has
failed to establish her entitlement to recovery on a claim of quantum meruit as
a matter of law.  See Herbst, 995 S.W.2d at 315. 
Therefore, the trial court erred in rendering judgment for Heilman on
her claim.

We sustain Doyle’s legal sufficiency
challenge.  Because the issue is
dispositive, we need not address Doyle’s other issues on appeal.

 

Conclusion

We reverse the judgment of the trial
court and render judgment that Heilman take nothing.

 

 

                                                          George
C. Hanks

                                                          Justice

 

Panel consists of Justices Jennings,
Hanks, and Bland.

 











[1] At
trial, Heilman testified that she visited Miller on weekdays from 8 a.m. until
about 12:30 or 1 p.m.