**TEMPLETON PATENTS, LTD., Plaintiff,**
**v.**
**J. R. SIMPLOT COMPANY, Defendant**
(two cases).
**Nos. 3514, 3574.**

United States District Court
D. Idaho, S. D.
March 4, 1963.

William H. Langroise, Langroise, Clark & Sullivan, Boise, Idaho, for plaintiff, W. Brown Morton, Jr., Washington, D. C., John C. Oram, Jr., New York City, John T. Roberts, Pennie, Edmonds, Morton, Barrows & Taylor, Washington, D. C., of counsel.

Jess B. Hawley, Jr., Hawley & Hawley, Boise, Idaho, for defendant, Lloyd E. Haight, Boise, Idaho, Edward B. Beale, Robert A. Doherty, Donald E. Egan, Beale & Jones, Washington, D. C., of counsel.

FRED M. TAYLOR, District Judge.

Plaintiff instituted two lawsuits against the defendant. Action No. 3514 was filed on February 24, 1959, and, as amended, charges the defendant with having infringed three United States patents owned by the plaintiff. Action No.

3574 was filed on February 1, 1960, and is based on an alleged breach of contract and on the alternative theory of unjust enrichment. By stipulation of the parties the two suits were consolidated and they came on for trial before the Court on January 8, 1962, solely for the purpose of determining the question of defendant's liability, if any. Plaintiff's damages will be determined at a subsequent hearing, if the same shall become necessary after a final determination of all of the issues now under consideration.

Plaintiff is a British corporation and is owned principally by Robert A. S. Templeton and his wife. Templeton is the chairman of the board and its managing director. Defendant is a corporation of the State of Nevada and has a principal place of business in the City of Boise, State of Idaho. This Court has jurisdiction under Sections 1332, 1338(a) and 1400(b), Title 28, U.S.C.A.

The facts and circumstances of the two lawsuits are closely related. Each suit involves a process for making a dehydrated potato powder which will, when combined with warm milk or water, readily reconstitute into a palatable dish of mashed potatoes comparable with that made by the common method using the fresh raw potato. Defendant is one of the leading manufacturers of this product in the United States. Plaintiff is the owner of three patents, each of which discloses a process for making said product, and it contends that the defendant's process infringes certain claims of each patent: namely, claims 1, 2, 4, 5, 6, 7 and 8 of United States Patent No. 2,119,-155, issued to Arnold Faitelwitz and Marcos Bunimovitch on May 31, 1938; claims 3 and 7 of United States Patent No. 2,352,670, issued to Zelmanas Volpertas on July 4, 1944; and claims 16 and 17 of United States Patent No. 2,520,891, issued to Eugene Joel Rivoche on August 29, 1950.

The evidence discloses that prior to the discoveries represented by the above patents the world had a long-felt need for a process which would produce an instant mash potato powder. Both World Wars especially created a demand for this dehydrated product as well as others. Its minimum bulk and keeping properties make it suitable for storage and, yet when combined with warm milk or water it instantly makes an acceptable food. The common potato is particularly adaptable for such a product because it contains approximately 80 per cent water by weight and 20 per cent solids, primarily starch. Many inventors recognized this fact, but until the 1930's none had been able to discover a process which would produce an acceptable food. Prior thereto inventors had been able to discover processes only for drying potato pieces or strips, or for making potato flour which could be used indirectly in the preparation of foods. However, in attempting to develop an instant mash potato product, two problems always plagued them: first, they had to prevent the starch cells from rupturing while being processed, or otherwise the reconstituted product would be pasty and unpalatable; second, they had to overcome scorching or, in other words, prevent the outer layer cells from hardening when drying, in order to render them reconstitutable when combined with warm milk or water. This is sometimes referred to as "case-hardening".

The first substantial contribution to the art of processing an instant mash potato powder was made by Arnold Faitelowitz, in Paris, France, in the 1930's. He discovered that the starch cells of most starch-containing vegetables could be separated without rupturing them if the vegetable was first partially dried to a moist powder which had lost at the most about 60 per cent by weight of its original water content before it was put through a second drying stage to reduce it to an acceptable product containing only 10 to 15 per cent of its original water content. Each of said drying stages was accomplished by means of heat applied to the cooked vegetable, which had been cut into small pieces. Faitelowitz applied for a patent in Great Britain on June 10, 1936, which application serves as the basis for his United States patent.

Both parties admit that the Faitelowitz process is somewhat crude and difficult to perform. Unless the drying stages are conducted very skillfully, the heat causes case-hardening. As a result his process has never been used for commercial production anywhere in the world. However, it served as the basic idea for the successful processes which followed after his initial breakthrough.

Volpertas and Rivoche were associated with Faitelowitz in France. Volpertas determined that the initial drying stage of the Faitelowitz process could be accomplished merely by adding some of the fully dried product to the cooked potatoes and allowing absorption to take place to reduce the moisture content of the entire mixture. When the moisture content equalized it could then be further dried by the application of heat. By this means the risk of case-hardening was substantially decreased because drying by heat during the first stage of the process was eliminated, making the entire process more economical, less difficult to perform and more certain to produce an acceptable product. Volpertas' improvement on the Faitelowitz process is referred to herein as the add-back method or step. This method is old in the art of food dehydration, but Volpertas was the first to apply it to a process for making an instant mash potato powder. Volpertas, whose name is now Zelman Volpert, applied for a patent in Great Britain on October 14, 1937, which application serves as the basis for his United States patent. His patented process will be more fully examined hereinafter.

Rivoche is given credit for an improvement which prescribes limitations within which the Volpertas process can always be successfully performed. Whereas Volpertas teaches that the add-back method should be used in the first drying stage until the moisture content of the mixture has been reduced by about one-half, Rivoche teaches that said method should be employed until the mixture contains not more than about one-half of its original moisture content. When the initial drying stage is conducted to that point or below, the then moist powder can be dried by heat without substantial risk of case-hardening. The British application which serves as the basis for Rivoche's United States patent was filed on September 16, 1939.

These processes were first introduced to Templeton by Rivoche in Great Britain in 1939. For several years Templeton had been interested in the vegetable drying industry and had made studies in Europe to determine if a successful process for manufacturing an instant mash potato powder had been discovered. Rivoche was the first to show him an acceptable product and to disclose a feasible process for making the same. A year later Templeton obtained exclusive licenses to the processes in question in behalf of Farmers' Marketing & Supply Company, plaintiff's predecessor. During World War II an instant mash potato drying industry arose in Great Britain based upon these same or similar processes.

Meanwhile in the United States the defendant was engaged in fruitless efforts to discover or obtain a successful process to fill the needs of our government. Defendant met with no success despite the fact that it had adequate facilities, finances, and skilled men in the art. Its expert witness, Ray W. Kueneman, had been employed by the Department of Agriculture during World War II. He had visited dehydration plants abroad to gather information for our government, and had seen and made diagrams of plant operations in Great Britain which were using processes similar to the ones in suit. After the war the defendant employed his services, but for the next five years a successful process still eluded it. Templeton visited the United States in 1945 and became acquainted with defendant's efforts. Defendant's officers professed an interest in plaintiff's processes; however, at this time plaintiff had not perfected its rights thereto in this country.

Templeton returned to the United States in 1949. Having acquired to his satisfaction the exclusive world-wide

**52**

rights to the above processes, he made another visit to the State of Idaho to confer with the officials of the defendant company. They expressed an interest in joining forces to develop the product in this country. On March 4, 1949, Templeton conducted a series of demonstrations at the defendant's plant in Caldwell, Idaho, during which he disclosed what he considered to be the basic teachings of the patents in suit. The record discloses that defendant was highly impressed by, and interested in, the processes. The parties reached an informal understanding in regard to developing the processes and the industry in this country, which was to be formalized later subject to the approval of their respective legal counsel. The terms of said agreement were left to future negotiations which, as events transpired, were very extended, and the parties ultimately failed to reach an understanding. The nature and extent of their dealings is more pertinent to plaintiff's contract action. Suffice it to say here that while said negotiations were being conducted the Korean War occurred and defendant went into production to help fill the needs of our government. Defendant made no attempt at the trial to explain this sudden transition from failure to success in processing an instant mash potato powder. The conclusion is inescapable that it adopted the teachings of said patents for its own operations.

The parties are in substantial agreement on what defendant's process is, and has been, since it began production. Its process is illustrated by Plaintiff's Exhibits No. 6 and No. 14, each of which was thoroughly explained by witness Ray W. Kueneman, director of research and development for the food processing division of the defendant company. It uses the Faitelowitz two-stage drying principle, but instead of drying by heat in the first stage as Faitelowitz teaches, defendant uses the add-back method. By this method defendant has always reduced the moisture content of the mixture to between 30 and 40 per cent before beginning the second drying stage.

Defendant conducts the second drying stage by means of heat, or a stream of hot air, using dryers which operate under a slightly subatmospheric pressure. This drying system reduces the moisture content of the mixture to approximately 12 to 14 per cent. Thereafter the moist powder is sifted and put through another system which reduces it to a finished product containing not more than about 6 to 7 per cent of its original moisture.

Plaintiff submits that what takes place in defendant's process after the sifting step is not relevant to the question of infringement (Tr. 117), and defendant does not quarrel with this contention. Nor does defendant argue that the various apparatus used in its process from time to time or the minor changes made in the steps of the process in any manner changed the basic nature thereof, and the Court finds this to be the fact.

### CASE NO. 3514 PATENT INFRINGEMENT

In considering the issues raised by plaintiff's patent infringement suit, the Court is mindful that the usual practice is to determine the question of the validity of the patent before passing on the question of infringement. However, it appears that there is an exception to this rule where non-infringement is apparent and the patent involved is not clearly invalid or merely a paper patent. Kierulff v. Metropolitan Stevedore Company, 300 F.2d 614 (9th Cir. 1962); Kemart Corp. v. Printing Arts Research Laboratories, 201 F.2d 624 (9th Cir. 1953). Under those circumstances the issue of validity is considered academic as, of course, are the other defenses raised by the alleged infringer, which are numerous in most patent infringement cases. The Faitelowitz and Volpertas patents in suit are most susceptible of disposition in the above manner, for the Court finds that defendant's process clearly does not infringe any of the claims of said patents.

Plaintiff contends that the defendant's process infringes claims 1, 2,

4, 5, 6, 7 and 8 of the Faitelowitz patent. Although it is fundamental patent law that the claims of a patent are the sole measure of the grant and the means by which an infringement is to be determined, Neff Instrument Corp. v. Cohu Electronics, 298 F.2d 82 (9th Cir. 1961), plaintiff did not attempt to make any comparison between the accused process and the claims in question at the trial or in its written briefs. This oversight can be justified only by the fact that no significant comparison exists. Claim 1 of the patent reads as follows:

"A method of reducing potatoes and other starch-containing vegetables to the form of a dry powder in which the starch is preserved in its initial form which comprises cooking the vegetables at a temperature which must not substantially exceed 100 degrees C., cutting the cooked vegetables into small pieces, partially drying the pieces, at a temperature which also must not substantially exceed 100 degrees C. until they have lost at the most about 60% by weight of their initial water-content, reducing the partially dried pieces to the form of a moist powder and further drying the moist powder, at a temperature which must not greatly exceed 80 degrees C., until it has a water-content of approximately 10–15% by weight." (Plaintiff's Exhibit No. 1).

Each of the remaining claims of the Faitelowitz patent is dependent on claim 1. Hence, each is based on a process which accomplishes the all-important initial drying stage by means of heat which must not substantially exceed 100 degrees C. In comparing defendant's process with these claims, it is obvious that defendant accomplishes this stage by using the add-back method which does not involve, and is contrary to, the method employed by Faitelowitz. Add-back is the improvement attributed to Volpertas and which is specifically disclosed in claims 16 and 17 of the Rivoche patent. Plaintiff urges that the doctrine of equivalents is applicable, but does not attempt

to apply the same. The Court believes that the Faitelowitz claims cannot be construed by any reasonable application of said doctrine to cover the defendant's process.

Plaintiff's main contention is that the defendant's process infringes the Faitelowitz principle. According to plaintiff's expert witness, Templeton, this principle is that: "the potato cells, within which are enclosed the starch grains, may, after cooking, be separated without injury to the membrane of the cells after a partial drying and before final drying." (Tr. 204). In the first instance, it has been recognized that one cannot patent a principle. Kemart Corp. v. Printing Arts Research Laboratories, 201 F.2d 624 (9th Cir. 1953). Secondly, the evidence convincingly demonstrates that Faitelowitz did not invent a practical process for putting his principle to use. Templeton admits that said process has never been used for a commercial operation anywhere in the world. It took the alleged inventions of Volpertas and Rivoche to put said principle into actual operation, and their improvements over the Faitelowitz process are the distinguishing features, not only of their processes, but of most of the processes used in the industry, including defendant's process. Accordingly, the Court holds that the plaintiff has failed to sustain its burden of proving that defendant's process infringes the claims of the Faitelowitz patent. The existing evidence clearly supports a finding of non-infringement to each and every claim of the Faitelowitz patent in suit.

Plaintiff contends that the defendant's process also infringes claims 3 and 7 of the Volpertas patent. These claims read as follows:

"3. The process of preparing potatoes in powdered form, which includes all of the constituent elements of the potato other than water and which is capable of being converted into mashed potatoes by the simple addition of hot liquid, which process consists in cooking potato pieces

in an environment of steam at a temperature of substantially 100 degrees C., thereupon pre-drying the potato pieces in the absence of mechanical pressure thereon until the initial weight of the potato mass has been reduced by about one-half due to the loss of water, cooling the potato mass to a temperature in the order of 10 degrees C. and mechanically converting the same into a moist powder and finally drying the moist powder under moderate heat and vigorous stirring in vacuo, until the water content of the powdered potatoes is down to about 12 to 15 per cent."

"7. The process of preparing potatoes in powdered form, which includes all of the constituent elements of the potato other than water and which is capable of being converted into mashed potatoes by the simple addition of hot liquid, which process consists in cooking potato pieces in an environment of steam at a temperature of substantially 100 degrees C., thereupon pre-drying the potato pieces in the absence of mechanical pressure thereon until the initial weight of the potato mass has been reduced by about one-half due to the loss of water, cooling the potato mass, mechanically converting the same into a moist powder, drying the moist powder under moderate heat and stirring in vacuo until the water content of the powdered potatoes is down to about 12 to 15 per cent, collecting the potato powder thus prepared to a substantial bulk and continuing the heating thereof until the water content is reduced to between 6 and 10 per cent." (Plaintiff's Exhibit No. 2).

Volpertas' alleged contribution to the art of processing an instant mash potato powder is set forth on page 12 of Plaintiff's Main Brief After Trial. There plaintiff states:

"That inventive concept of the Volpert patent *with which we are now concerned* resides in the dis-covery that the first stage of drying the cooked potato can be accomplished and the moist powder for the second stage simultaneously produced simply by adding to, and gently and thoroughly mixing with, the cooked potato a sufficient quantity of previously fully-dried powder product. This process permits reducing the water content of the cooked potato mass in an economically practical way and without risk of hardening or scorching in the first drying stage." (Emphasis added).

This alleged discovery is the add-back method or step, and this is admittedly used by the defendant in its process. However, the serious question posed by defendant is whether the above claims of said patent include this method.

Section 112, Title 35, U.S.C.A., of the Patent Laws of the United States, and its predecessor, compel an applicant for a patent to conclude his application with "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention" after *first* having set forth in the specification the "best mode contemplated by the inventor of carrying out his invention." Neither of the above claims of the Volpertas patent points out nor distinctly claims the add-back method. Said claims refer only to "pre-drying the potato pieces in the absence of mechanical pressure" to reduce the moisture content of the cooked potatoes in the first stage of the process. The method used to accomplish pre-drying is not disclosed. Resorting to the specifications which are supposed to show the inventor's best mode for carrying out his process, the Court finds that said pre-drying is to be accomplished by heat. This method is referred to on several occasions. Thereafter, the applicant explains that if his process, using heat for pre-drying, is carried on in an ideal manner, no coarse particles should appear in the potato powder. However, he elaborates, that if there are some coarse particles, the same may be reclaimed by softening them by the add-back method. Then it

is stated that: "In commercial practice, the result set forth in the previous paragraph (reclaiming the coarse particles by add-back) may be attained in continuous operation" and he goes on to illustrate the add-back method. (Plaintiff's Exhibit No. 2). In view of this disclosure in the specification, plaintiff argues that claims 3 and 7 include the add-back method or step and that defendant's process is equivalent to said claims in all respects. However, it should be noted that Volpertas *specifically* claimed an add-back step in claims 5 and 8 of his patent which claims are *not* in suit. Therein said step is used at other stages in the process and not for the purpose of pre-drying the cooked potatoes in the first instance. The Court believes that the reason Volpertas did not specifically claim the add-back method for accomplishing pre-drying in the claims in suit is quite obvious from an examination of the patent's file wrapper.

Defendant urges said examination to support its contention that plaintiff is estopped from including the add-back method in claims 3 and 7 on the ground of file wrapper estoppel. This doctrine is succinctly defined in D & H Electric Company v. M. Stephens Mfg., 233 F.2d 879 (9th Cir. 1956), as follows:

"This is simply the exercise of the doctrine of 'file wrapper estoppel'— the gravamen of which is that an applicant who acquiesces in the rejection of his claim, and accordingly modifies it to secure its allowance, will not subsequently be allowed to expand his claim by interpretation to include the principles originally rejected or their equivalents." Id. at 883–884.

The file wrapper of the Volpertas patent is somewhat lengthy. As the application states, *it is a continuation, in part, of copending applications.* The most pertinent copending application is No. 254,-739 which was filed on February 4, 1939, in which Volpertas sought to obtain a patent based on a French application. In his copending application he attempted specifically to claim a process wherein the vegetables were dried by the add-back method, but the examiner emphatically rejected such claims in view of existing patents which the examiner concluded covered such a method. Volpertas appealed on July 1, 1941. The application was later vested in the Alien Property Custodian and the appeal was dismissed on June 12, 1943, at the applicant's request and because of an existing application for the present patent. The application in question was first filed on January 1, 1942, which the file wrapper discloses was approximately the same time the add-back method claims of said copending application were finally rejected by the examiner. (Plaintiff's Exhibit No. 2, File History (3)).

■ Under the above circumstances the Court is of the opinion that Volpertas abandoned his claim to the add-back method for the process disclosed by the claims in suit. The evidence reveals that he abandoned it because his experience with his copending application taught him that such a claim would be rejected in view of existing patents. The method which he did claim for pre-drying the potatoes during the first stage of his operation is the use of heat which is plainly disclosed by his specification. This method cannot be construed to be in any manner equivalent to the add-back method used by the defendant. Accordingly, the Court finds that the defendant has clearly not infringed claims 3 and 7 of the Volpertas patent. Said patent and defendant's process are also materially different in the degree of cooling employed in each, but, in view of the above, a discussion of this distinguishing feature would be academic.

■ The remaining claims in suit relate to the patent of Eugene Joel Rivoche, who was the last of the three patentees in question to obtain a patent on a process for making the instant mash potato powder. Here there is a striking similarity between the defendant's process and the claims in suit, and the Court deems it necessary to consider the question of validity first. In so doing the

Court is mindful of the presumptions favoring validity and that the defendant has the burden of proving otherwise by clear and convincing evidence. Neff Instrument Corp. v. Cohu Electronics, 298 F.2d 82 (9th Cir. 1961); Hayes Spray Gun Co. v. E. C. Brown Co., 291 F.2d 319 (9th Cir. 1961). In this instance the presumption of validity is buttressed also by other factors present in this lawsuit which are analogous to the situation which existed in Colgate-Palmolive Company v. Carter Products, 230 F.2d 855 (4th Cir. 1956). There the Court said that the following aided the presumption of validity:

> " * * * the fact that the patented product entered at once into wide public use and achieved outstanding commercial success, and from the fact that it was copied by an infringer who was one of the largest soap manufacturers of the country and who had been trying in vain to develop a similar product but had been unable to do so until the knowledge of one of the patentees was obtained." Id. at 862.

Nevertheless, the Court is also cognizant of the requirements necessary for patentability that are specified in Sections 101–103, Title 35, U.S.C.A., of the Patent Laws of the United States, and the Rivoche claims have been considered with regard to all of the above factors.

The Rivoche patent was granted on August 29, 1950, and expired on September 16, 1959. It is based on an application filed in Great Britain on September 16, 1939; and received the benefits of Public Law 690 (the Boykin Act), 60 Stat. 940 which extended the time for filing his United States application. The claims of the Rivoche patent in suit read as follows:

> "16. The method of preparing cooked starchy vegetable foodstuff, in readily-reconstitutable form, from a mass of the cooked vegetable, which comprises performing successively and in the order set forth, the steps of thoroughly mixing the same with the same kind of dried and pow-

dered vegetable foodstuff in amount to produce a resultant mixture containing not more than about 50% by weight of moisture, and drying said resultant mixture to form the readily-reconstitutable product, said drying operation being carried out so as to preserve substantially the structure of the vegetable solids, including capillary properties thereof.

> "17. The method of claim 16 in which said resultant mixture is subjected to a sieving operation to disintegrate it into relatively small particles before it is subjected to the final drying operation." (Plaintiff's Exhibit No. 3).

Although the above claims clearly set forth the add-back method or step, plaintiff admits, and the Court finds, that Rivoche did not invent the same. His contribution to the art of processing an instant mash potato powder which is in suit is stated on page 13 of Plaintiff's Main Brief After Trial wherein it is said:

> "The only one Rivoche's contribution to the art that is presented for adjudication here can be simply stated as accurately prescribing a limitation within which Volpert's discovery can always be successfully performed. Rivoche determined that the Volpert's procedure for producing a moist powder for final drying would invariably succeed if the mix of cooked potato and dry product was brought to a total moisture content not exceeding 50% by weight at the time of reduction to the moist powder."

Hence, the crucial portion of the above claims is:

> " * * * the steps of thoroughly mixing the same with the same kind of dried and powdered vegetable foodstuff in amount to produce a resultant mixture containing not more than about 50% by weight of moisture, * * *."

The Rivoche application and its British counterpart reveal that he considered the

said 50% minimum moisture reduction to be the critical point in his process. It is at this point, or below, that the first drying stage ends and the second drying stage begins, for at this point, or below, sufficient water has been removed from the cooked potatoes to allow them to be dried by heat without substantial risk of case-hardening. Rivoche teaches that this point may be reached by several methods, including the add-back method. The difference between Rivoche's singular improvement and the prior art is quite subtle, but the evidence supports the conclusion that his improvement does insure a more successful result. However, because of the slight degree of improvement over the prior art, the paramount question for determination is whether his improvement rises to the dignity of invention. In this regard the Supreme Court of the United States said in Sinclair & Carroll Co. v. Interchemical Corporation, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945):

> "A long line of cases has held it to be an essential requirement for the validity of a patent that the subject-matter display 'invention', 'more ingenuity * * * than the work of a mechanic skilled in the art.' (Citing cases). This test is often difficult to apply; but its purpose is clear. Under this test, some substantial innovation is necessary, an innovation for which society is truly indebted to the efforts of the patentee. Whether or not those efforts are of a special kind does not concern us. The primary purpose of our patent system is not reward of the individual but the advancement of the arts and sciences. Its inducement is directed to disclosure of advances in knowledge which will be beneficial to society; it is not a certificate of merit, but an incentive to disclosure. (Citing cases). Consequently it is not concerned with the quality of the inventor's mind, but with the quality of his product." 325 U.S. at 330–331, 65 S.Ct. at 1145.

The evidence reveals that Rivoche's above contribution to the art of processing an instant mash potato powder added very little, if anything, to the known art. Defendant cites several foreign patents to support its conclusion that he added nothing which could be called an invention. However, said patents concern entirely different processes for making entirely different products. The most pertinent prior art is that disclosed by the patents of Faitelowitz and Volpertas. These patents show that Rivoche was not the first to determine a probable point of departure between the first and second stage drying operations. Faitelowitz teaches that the cooked potatoes should be first dried until they have "lost at the most about 60% by weight of their initial water-content." Volpertas said, "until the initial weight of the potato mass has been reduced by about one-half due to the loss of water." Rivoche's alleged improvement is the direction to dry the potatoes down to the point where they contain "not more than about 50%" moisture. The Court believes that Faitelowitz' teaching might exclude experimentation beyond the point stated, but that Volpertas' suggests experimentation in order to find the optimum point of departure between the two drying stages. Rivoche does nothing more than teach a minimum point of departure, leaving the optimum for experimentation. The defendant has been able to obtain an acceptable product by drying the cooked potatoes down to the percentages specified by all of the patents, but has, as the Court believes one skilled in the art would have, experimented to find the optimum point of departure as is suggested by Volpertas. Therefore, the Court is of the opinion that Rivoche's alleged improvement over Volpertas, is as contended by defendant, not inventive. The fundamental law in point is cited and quoted in Locklin v. Switzer Brothers, Inc., 299 F.2d 160, on pages 163–164 (9th Cir. 1961), which, in part, reads as follows:

> " '* * * a mere carrying forward of new or more extended application

of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent.'

\* \* \* \* \* \*

" ' \* \* \* More particularly, where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation.' "

Accordingly, claim 16 of the Rivoche patent and dependent claim 17 are invalid.

## CASE NO. 3574 CONTRACT ACTION

By this action plaintiff seeks to recover damages from the defendant for the alleged breach of an oral contract, or, in the alternative, to recover the value of benefits received by defendant on the theory of unjust enrichment. Plaintiff contends that the alleged contract was made in 1949 and that the breach occurred in November, 1956, when Templeton "reluctantly elected to treat the Defendant in breach." (Plaintiff's Main Brief After Trial, p. 69). Plaintiff filed its complaint on February 1, 1960. In its answer the defendant alleged several affirmative defenses, relying primarily on the statute of limitations, laches, and the statute of frauds. Both parties agree that the law of the State of Idaho governs.

The most credible evidence concerning the dealings and negotiations between the parties is their correspondence which is set forth in chronological order in Plaintiff's Exhibit No. 8. The parties concentrated on their patent infringement controversy at the trial and only a small portion of the testimony of the witnesses involved this action. This limited testimony was somewhat vague and indefinite, obviously because of the time which had elapsed since their negotiations in 1949. Hence the Court has given more weight to this correspondence and hereinafter all references to dates refer to letters contained in said exhibit.

The Court finds from a consideration of the record, and in particular from Plaintiff's Exhibit No. 8, that no contract of any nature was ever made between the parties. The record indicates that in March, 1949, they initially came to some broad general understanding as to what their arrangement should be for development and production of an instant mash potato powder for sale in this country. The gist of their proposed agreement was that plaintiff would grant defendant an exclusive license to use the Faitelowitz, Volpertas and Rivoche processes and would assist defendant in establishing its operation in exchange for a royalty based on production. However, it was at all times understood by plaintiff that any agreement was subject to the approval of defendant's legal counsel. (Letters of March 31, 1949; April 11, 1949; May 12, 1949; August 10, 1949; October 12, 1949; and August 30, 1950). As events transpired, it was the defendant's patent counsel who prevented the parties from coming to terms for he would not approve of any agreement based on the patents in suit.

There were two main areas of conflict. The first involved plaintiff's alleged ownership of the patents. In 1949 plaintiff owned only the Volpertas patent. The Rivoche application was still pending and was not granted until August 29, 1950. The Faitelowitz patent was, and had been since 1943, the property of the Alien Property Custodian, and 75 per cent of it had been assigned by Faitelowitz to one Marcos Bunimovitch in 1938. Plaintiff did not cure these defects in its title to the Faitelowitz patent until long after the negotiations between the parties had terminated. Secondly, defendant's patent counsel emphatically objected to the validity of the patents and, though Templeton and plaintiff's counsel attempted to convince him otherwise, he remained adamant in his position against any and all agreements which were based on said patents.

The first formal agreement presented for the defendant's consideration was drawn by plaintiff's counsel and forwarded to the defendant on March 28, 1949. Defendant's counsel immediately raised the question of the validity of the patents and the proposed agreement went unsigned. Nevertheless the parties continued to negotiate on the assumption that the legal problems would be resolved. Templeton encouraged the defendant to continue its experiments with the processes and he supplied defendant with certain technical information and advice in order that defendant could get into production as soon as possible. Templeton believed that defendant's counsel was on the "wrong track" in regard to his objections to the validity of the patents. (Letter of May 12, 1949). Nevertheless, by October 12, 1949, they had not come to any understanding, so Templeton wrote a letter to J. R. Simplot, president of the defendant company, in which he demanded that the defendant come to terms or he would terminate their negotiations. He also requested that defendant pay him $1,750.00, constituting half of his traveling expenses and attorney's fees. Simplot denied that defendant had any obligation to pay said sum. The defendant did, however, forward to plaintiff's counsel a proposed agreement which materially differed from the one initially proposed by plaintiff. (Letter of December 16, 1949). Plaintiff's counsel would not advise Templeton to sign this agreement and it too went unsigned. (Letter of December 21, 1949). The negotiations continued through the spring of 1950 and were finally terminated. (Letter of July 24, 1950). Thereafter, plaintiff sought to license other producers in this country and held a nonexclusive license for the defendant. Plaintiff appointed one W. A. Scott as its agent to negotiate with the defendant and other producers, but insofar as the defendant was concerned, his efforts likewise were unsuccessful.

The defendant went into full production in 1951 without having reached an agreement of any nature with the plaintiff. Plaintiff was well aware of this fact, but took no action to prevent defendant's use of the processes in question nor to recover any compensation for the technical information which had been furnished to the defendant. Instead plaintiff concentrated on attempting to obtain defendant's approval of some form of agreement. On August 18, 1951, plaintiff proposed an agreement based solely on the Volpertas and Rivoche patents, but the defendant would not come to terms on this basis either. In June, 1952, Templeton, Simplot and another producer held a conference in Boise, Idaho, in which they attempted to resolve their differences. The defendant however, still acting on the advice of counsel, would not agree to plaintiff's terms. (Letter of June 19, 1952). This was the last serious effort made by the parties to reach an agreement. Defendant continued to produce the instant mash potato powder and by 1954 had united with other producers in a joint defense against any legal action which might be taken against them. (Letter of May 4, 1954). The plaintiff threatened such action, but none was forthcoming until in 1959 when its patent infringement action against the defendant was filed and this action was instituted a year later.

Plaintiff's delay in asserting its rights is predicated on the fact that it was not able to obtain the Faitelowitz patent from the Alien Property Custodian until November, 1956. Plaintiff contends that its contract action accrued only when it could have been successfully maintained, and that the alleged contract envisioned rights under all three patents which were so intertwined that suit could not be brought on fewer than all of them. Therefore plaintiff reasons that although by 1950 it owned both the Volpertas and the Rivoche patents, a successful action could not have been maintained until it also obtained complete title to the Faitelowitz patent. This argument is untenable and is obviously designed to overcome the statute of limitations which in Idaho compels suit to be brought for breach of an oral contract within four

years after the cause of action accrues. Sec. 5–217 Idaho Code.

■ Plaintiff's reasoning is premised on the conclusion that a contract existed, while the record clearly shows that the parties never came to a meeting of the minds on any of the material terms of their proposed agreement. It is settled law in the State of Idaho that:

" 'In order to constitute a contract, there must be a distinct understanding, common to both parties. The minds of the parties must meet as to all of its terms, and, if any portion of the proposed terms is unsettled and unprovided for, there is no contract. * * * ' " Brothers v. Arave, 67 Idaho 171, 175, 174 P.2d 202, 205 (1946).

The record discloses that the parties were in complete discord on the very essence of their proposed arrangement. Defendant questioned the validity of the patents and plaintiff's ownership thereof, and plaintiff would not agree to the minimum royalty which defendant would have reluctantly paid under the circumstances. Their negotiations were fraught with these conflicts from the beginning and it was only Templeton's perseverance that kept the negotiations alive.

■ Assuming arguendo that the parties made a contract in 1949, plaintiff could have granted only those rights to the Faitelowitz patent which it then possessed, and could have brought suit on those rights when defendant went into production in 1951 without paying any royalties. However, the evidence reveals the plaintiff allowed the defendant to produce potato powder and benefit from the alleged technical information furnished by Templeton for nine years before instituting suit. This contract action appears to have been an afterthought for if any contract was made in 1949, it was breached when the defendant went into production in 1951 and thereupon plaintiff's action accrued. Plaintiff suggests that it was lulled into a sense of security by the defendant's willingness to negotiate, but by 1954 the defendant

was openly flaunting plaintiff's endeavors to license producers in this country and it was, or should have been, evident to the plaintiff that the defendant had no intention of living up to any of its alleged promises. Therefore, in any event, plaintiff's action is barred by the statute of limitations, I.C. Section 5–217, supra, because the action was not commenced until February 1, 1960, more than four years after the cause of action accrued.

■ Plaintiff's action based on unjust enrichment may have some merit, but unfortunately it too is barred by the statute of limitations. The Court believes that the plaintiff did supply the defendant with technical information which was of some benefit. This information, however, was all furnished to defendant in 1949, prior to the time the parties had come to the end of their negotiations concerning a nonexclusive license. Plaintiff had made demands for his traveling expenses and attorney's fees and, likewise, should have made some demand for the value of said information, if it had any actual value over and above the teachings of the patents. Plaintiff made no such demand until this contract action was filed.

■ An action based on the theory of unjust enrichment presupposes that circumstances exist from which the court will create an obligation to allow one to recover the value of the benefits conferred on another which in equity and good conscience should not be retained without payment therefor. Hixon v. Allphin, 76 Idaho 327, 281 P.2d 1042 (1955). The obligation which is implied by law is not a true contract, but it partakes of the nature of one and is governed by the statute of limitations applicable to oral contracts. See Lazzarevich v. Lazzarevich, 88 Cal.App.2d 708, 200 P.2d 49 (1949). The appropriate Idaho statute states that "an action upon a contract, obligation or liability not founded upon an instrument of writing" must be commenced within four years after said action accrues. Section 5–217 I.C., supra. At the very

latest plaintiff's action accrued in 1954 and hence is barred by said statute of limitations because it was not commenced until February 1, 1960.

In accordance with the foregoing, it is the opinion of this Court that plaintiff take nothing under and by virtue of its complaint in each of said cases Nos. 3514 and 3574; and that judgment be entered in favor of the defendant and against the plaintiff in each case.

Counsel for the defendant shall prepare Findings of Fact, Conclusions of Law, and a proposed Judgment for each case separately, serve copies of the same on counsel for the plaintiff, and submit the originals to the Court.