## Batts v. Snook et al.

(Decided May 21, 1937.)

GILBERT & DAVIS and COLEMAN WRIGHT for appellant.
KINSOLVING & REASOR and C. G. BARRICKMAN for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant and defendant below, Lindsay Batts, at the time of the transactions here involved, and prior thereto, was the owner of an improved farm in Shelby county, Ky., containing about 175 acres. It was in a high state of cultivation and was employed by defendant for agricultural purposes and also for the operation of a dairy business to a limited extent. After supper on Sunday night, April 14, 1935, defendant answered a call over his telephone which was made by the appellee and one of the plaintiffs below, Holly Morris, from a garage in Simpsonville, Ky. The substance of it, according to Morris, was an inquiry by him of Batts as to whether the latter would sell his farm, and if so at what price; to which defendant replied that he had not offered his farm for sale but that he would sell anything he possessed if he could obtain his price, and that he would take $16,000 for his farm. Perhaps something was said about coming out to look at it later on, and Morris claims that he stated to defendant in that telephone message that "he had some buyers" who contemplated buying a farm within reasonable reach of the city of Louisville; but defendant denied the quoted statement and said that he did not know Morris and understood from the telephone message that his name was "Ollie

Morris," whom he had never seen or heard of before, and that he did not name in that conversation either the fact that he was a real estate agent or who the prospective purchaser was, i. e., whether it was Morris or some other person for whom he might be acting. Morris admitted that he did not state to defendant in that conversation that he (Morris) was a real estate agent.

At that time the other plaintiff, Snook, was also a real estate agent with an office in Louisville, Ky., but defendant did not know him, nor was his name mentioned in Morris' telephone message. However, there was some effort made to show that Snook had met defendant on some former occasion under circumstances that would impart the information that Snook was a real estate agent; but defendant contradicted plaintiff's testimony to that effect and stated that if he had ever been informed in any manner that there was such a person as Snook, or that he was in the real estate business, it had faded from his memory, and we think the evidence in the case as a whole clearly shows that on the night of the telephone conversation between Morris and defendant the latter was entirely unacquainted with either of the plaintiffs, Morris or Snook, or had any knowledge of the business in which they were engaged.

On the following Sunday, April 21, of the same year, plaintiffs with one Wesley Rogers, the actual contemplated purchaser, his fiancee, and his brother all came out from Louisville to inspect the Batts farm, but neither Mr. nor Mrs. Batts was at home. Afterwards, and perhaps on the next day, the same crowd with the exception of the prospective purchaser, Wesley Rogers, again visited the Batts farm, the price of which had already been communicated to Rogers at a time when Batts neither knew the plaintiffs nor their business, and, of course, when he neither suspected, nor had reason to suspect, that they would exact or demand of him any commission if a sale of his farm should eventually be effected to the one for whom Morris may have been acting as developed by his telephone message. On that visit after the parties had thoroughly inspected the premises—including the residence thereon and other buildings—and of course after the price for the farm had been submitted both to Rogers and his fiancee whom he shortly thereafter married, Snook testified that this occurred: "Mr. Batts came off the porch, I walked

around to the back of the house with him, I said, 'Lindsay, these folks like the looks of this farm mighty well, and it looks a whole lot better than it did when you bought it, they are interested in it.' By that time we went through the kitchen Mrs. Batts had let them in the front door or in the house, we come in and I went upstairs with them, I knew the house pretty well, that is I hadn't been in its since it had been fixed up some, I didn't go to the basement. I don't think, I don't know whether Mr. Batts went with them or was still on the front porch. I said to him, 'How much less than sixteen thousand dollars will you take,' he said, 'don't think I can take any less,' I said, 'Will you pay five per cent commission,' he said, 'What will that amount to,' Mr. Morris says five times sixteen. I said the regular real estate commission, eight hundred dollars. He said 'I don't think I can pay that, I might pay half of it,' so that was all that was said about the commission." Batts concurred in that statement with the exception that he did not state that "I might pay half of it" or any other amount, and he testified that he then positively insisted that he must have $16,000 net for his farm.

Later in the week after other visits to the farm by the eventual purchaser's fiancee—some of which were made with him and others with his brother—an agreement was reached whereby Batts sold and later conveyed his farm to Wesley Rogers for the only price ever named in any of the negotiations, i. e., $16,000. Some weeks after execution of the deed, Batts also sold to his vendee his farming implements, and all or a portion of his cows, for something like $3,500. After such transactions were completed, and on May 17, 1935, plaintiffs filed this ordinary action against Batts in the Shelby circuit court to recover against him $925 as alleged commission of 5 per cent. due them upon the amount realized from both his farm and the personal property purchased by Rogers. The petition alleged that defendant had placed in their hands his farm and his personal property for sale before any sale thereof was made and that defendant "was told the price to be charged as commission, to-wit: Five per cent on the entire purchase price of the farm including livestock, farming implements," etc. They then alleged that after such negotiations were had, and such information had been imparted to defendant by plaintiffs, he then placed his

farm and his personal property in their hands for sale on the terms previously stated.

Defendant in his answer denied each and every such allegation made in the petition, and positively averred that he never at any time employed either of plaintiffs to effect a sale of his farm or any other property. Furthermore, he averred that he was a stranger to plaintiffs and knew nothing of their business and never heard of either of them until the telephone message by Morris to which reference has been made. His testimony that he never agreed to pay on the occasion referred to by Snook in his testimony any amount whatever, or to compromise the demand for commission for any sum whatever save and except that he told Snook and others that if they wanted or expected any commission they should obtain it from the purchaser, since the price submitted by him of $16,000 was net to him. He denied that anything was ever said between him and the agents with reference to the sale of the personal property which had not even been mentioned in Morris' telephone message. He was fortified by a tenant on the place with reference to what he stated to Snook, and was corroborated by Rogers as to what occurred with reference to the sale of the personal property after the farm had been purchased.

Rogers testified that before he closed the negotiations for the purchase of the farm between him and defendant he became suspicious that, perhaps, Snook and Morris were intending to charge him (Rogers) commission, and he approached Snook on the subject and inquired of him whether or not he so intended. Snook told him that he contemplated no such purpose, whereupon Rogers asked him if he expected to collect a commission from Batts, to which he (Snook) gave a negative answer, but said that he expected to receive his pay from Morris. A reply to defendant's answer made the issues, and upon trial the jury, under the instructions of the court, returned a verdict in favor of plaintiffs for commission on the sale price of the farm, but denied their contention for commission on the sale price of the personal property. Defendant's motion for a new trial having been overruled, he prosecutes this appeal, urging through his counsel: (1) That the court erred in overruling his motion for a peremptory instruction offered at the close of plaintiffs' testimony and at the

close of all the testimony; but, if mistaken in that, then (2) that the verdict is flagrantly against the evidence; and (3) erroneous instructions. If ground 1 is sustainable, then it will be unnecessary to discuss or determine the other two. We have concluded that the court should have so peremptorily instructed the jury, and will now proceed to set forth our reasons for such conclusion.

Every opinion by every court of last resort to which we have had access, as well as every textwriter upon the subject, says that the rights of a real estate broker, and his customer whom he serves for compensation, arise exclusively from contract and that the services of the broker for which he seeks compensatoin is predicated solely thereon. The contract creating the relationship may be express or implied, but, "In order to raise an implied contract to pay for services [of a real estate broker], several things are necessary: * * * First, the services must have been performed under such circumstances as to give the recipient thereof some reason to think they are not gratuitous, nor performed for some other person, but with the expectation of compensation from the recipient." Segnitz v. Grossenbach Co., 158 Wis. 511, 149 N. W. 159, 160. That case, together with a number of others from other states, are cited and commented upon in an annotation to the case of Dickinson v. Hanley, 193 Mich. 585, 160 N. W. 389, Ann. Cas. 1918C, 1063, the annotation beginning on page 1064.

In the course of that annotation, in addition to the comment to which we have referred, we also note these: "The statement of an owner of real estate to a broker that he desires to sell certain of his property is not sufficient on which to base a claim by the broker for compensation for procuring a purchaser of the property." Also, "No contract of employment of a broker to sell real estate can be implied on the part of the owner after a flat refusal by the latter to pay a commission, if there are no other acts of his which may be construed as an employment." Those statements are fortified by citations of opinions, and they embody not only fairness and common sense, but justice as well. They are sustained by the text in 4 R. C. L. 298, sec. 43, which is referred to with approval in a great number of late cases from appellate courts and which we have consulted in our endeavor to determine the correct legal principle applicable to the facts of this case. That text

not only recognizes the foundation of the broker's right as resting exclusively in contract, but it also clearly points out the essentials for the raising of an implied contract of employment of the broker's services in the absence of an express one.

In commenting on the essentials for inferring an implied contract that text says, inter alia: "As it takes two to make a bargain, a broker is not entitled to be compensated for his services unless they are rendered pursuant to the express or implied request of his employer. To warrant a recovery upon his part he must have been actually employed by the person he is seeking to hold liable, for otherwise there would be no legal basis for his claim to compensation, notwithstanding the fact that a purchaser may have been found through information furnished by him. The calling of a broker is not preferred in the eye of the law to that of other occupations, and he is no more entitled to remuneration for services voluntarily rendered without any employment, express or implied, than any other member of the community. While a contract of employment may be implied from subsequent acts of ratification on the part of the alleged principal, to warrant the inference of a previous request, the owner must say or do something tending to prove that he accepted the broker as his agent in the matter—something more than merely selling to the party whom the broker, while acting as a volunteer, brought to him. Of course, the fact that a vendor accepts the benefits of a broker's efforts does not render him liable to the broker for commissions on the theory of ratification, where he did not know that the broker was working in his behalf, but on the contrary, the circumstances of the broker's endeavors indicated that he was working in the interest of the purchaser. * * * Furthermore it is practically universally held that the mere asking and receiving the price of property does not of itself make the broker the agent of the owner, entitling him to commissions, although he finds a purchaser, or the owner subsequently disposes of the property to one with whom the broker had negotiated."

Some of the cases cited in the notes to that text involve facts similar to those we have here, though not identical in all respects; while the others contain a greater similarity of facts. They present the legal principle that should control and be approved in such

cases, the substance of which is that in every case there should be a *contract,* and that a real estate broker is not to be favored in the law above any other person who enters into contractual relationships pertaining to any other character of business. To the same effect is the text in 9 C. J. 516, sec. 8, the part of which as pertinent to the facts of this case is: "But the mere fact that a broker asks and obtains from the owner of land the price at which he is willing to sell it does not of itself establish the relation of principal and agent between them." In note 78 to that text are a number of cases, the facts of which are practically parallel with those in this one, chief among which is Stevens v. Bailey & Howard, 149 Ala. 256, 42 So. 740.

A later case, containing facts very analogous to those appearing in this one, is Reeve v. Shoemaker, an Iowa opinion rendered November 17, 1925, and reported in 200 Iowa, 983, 205 N. W. 742, 743, 43 A. L. R. 839. We take this excerpt from the opinion as applicable here: "The existence of a contract of employment is essential to the right of a broker to a commission. Welch & Griffin v. Collenbaugh, 150 Iowa, 692, 130 N. W. 792. The evidence does not show that the defendant knew that the plaintiff or Reeve claimed to have the property listed as his agent or to be acting as his agent. The offer of testimony that was rejected is merely that Reeve [the broker] advised defendant that they expected to make a sale of defendant's lot and defendant said, 'All right.' There is no evidence or offer of evidence that the defendant knew that Reeve was claiming to act as his agent or that defendant ever agreed or expected to pay a commission. Defendant was not bound to forbid the agent from showing his property. Reeve might have been acting for an intended purchaser, so far as any knowledge of the defendant to the contrary is shown. It is not necessary that a property owner, in order to protect himself from liability for commission, be abrupt or discourteous or declare to every broker that approaches him that no employment exists when the broker is equally cognizant of the fact. Welch & Griffin v. Collenbaugh, 150 Iowa, 692, 130 N. W. 792; Viley v. Pettit, 96 Ky. 576, 29 S. W. [438] 439 [16 Ky. Law Rep. 650]; Castner v. Richardson, 18 Colo. 496, 33 P. 163; Stevens v. Bailey & Howard, 149 Ala. 256, 42 So. 740; Clammer v. Eddy,

41 Colo. 235, 92 P. 722; Harris Bros. v. Reynolds, 17 N. D. 16, 114 N. W. 369.''

There is an annotation to that opinion as reported in the last publication beginning on page 842, wherein it will be found that all courts approve the principle as contained in the excerpts supra, and which is not in conflict with any opinion from this court to which learned counsel have cited us. In every one of them there was either a prior employment of the broker by the owner, or the latter knew that the person with whom he was dealing was a broker and was expecting compensation from the owner and that he was not in the service of the prospective buyer under a promise of compensation by him from which an implied contract would arise. Such was true in one of the cases apparently the most strongly relied on by appellee's counsel, and which is Miller & Dawson v. Batten, 247 Ky. 339, 57 S. W. (2d) 33. But in that case there was an express employment of the broker by the owner of the property, and we held that under the facts the services had been performed within the time and in the manner contemplated by that contract of employment and, of course, we also held that when such an employed broker brought the owner and the prospective purchaser together and they later entered into a contract—the terms of which provided for compensation to the broker under his employment—then and in that case the owner would be liable for a commission, although the broker ceased to perform any service after bringing the owner and the eventual purchaser together. That situation is far removed from the one we have here. No employment in this case was ever even suggested until Snook mentioned the fact to defendant at the time of the inspection trip of the parties to his premises following the telephone conversation with Morris. Accepting what Snook said as occurring in that conversation, it then amounted to no more than his belated recital to defendant this—''Morris and myself are real estate agents and Mr. Rogers is our prospect and if you sell to him we will be entitled to a commission of 5%.'' Snook then admitted that defendant declined to pay it and stated in substance that he must have $16,000 net, but that he might pay a smaller sum. Batts denies any such qualified statement. However, if we should accept Snook's version of that conversation in its entirety, we

then have no facts upon which to base or infer an implied contract of employment other than the telephone conversation with Morris and the visit of the parties to Batts' house following it, with the alleged prospect of plaintiffs (Rogers, the eventual vendee) having been previously informed by both the agent and Batts that the latter would take $16,000 for his farm—all of which occurred before any payment of commission by Batts was even suggested, much less demanded. As a gentleman desiring to live up to his word, he should not be required, in order to avoid the demand for compensation, so tardily made, to repudiate his promise to Rogers to sell the latter his farm for $16,000, although up to that time (accepting the testimony of Snook to be true) no binding written contract of sale had been entered into between defendant and Rogers. Good faith and fair dealing required of plaintiffs to make their positions and contentions known to defendant before he had placed himself in the embarrassing position of having to repudiate his submitted promise of sale to Rogers, or be penalized by a commission on what he had insisted throughout should be the net amount that he would accept for his farm.

As stated in some of the cases and texts referred to, real estate brokers are not to be preferred over any other class of contractors. They should be required to deal frankly with their prospective customers and to act in good faith toward them, and not in a manner to conceal their eventual purpose through some sort of "horning in" process and to later demand compensation when none had ever been promised or anticipated by the one from whom it is later demanded. Under the facts of this case Batts had the right to complete the sales to Rogers without liability for commission even if Morris informed him in the telephone message that a third party was the prospective purchaser, since in that event, according to the authorities, supra, he would have the right, in the absence of an employment by him, to presume that the compensation, if any expected, was to come from the purchaser and not from himself.

We, therefore, conclude that plaintiffs failed in their testimony to establish a case entitling them to recover any part of the amount sued for, and for which reason the court should have directed a verdict for

defendant. For failing to do so the judgment is reversed, with directions to sustain the motion for a new trial, and for proceedings consistent with this opinion.