Henry S. **BLOOMGARDEN**, Appellant,

v.

Charles B. **COYER** et al.

No. 71–1765.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1972.

Decided May 9, 1973.

Edward Greensfelder, Jr., Washington, D. C., for appellant.

Max O. Truitt, Jr., Washington, D. C., for appellee, Georgetown-Inland Corp.,

et al.; Michael Valder, Washington, D. C., and Christopher Sanger, Gaithersburg, Md., entered appearances for appellees, Coyer and Guy.

Before SOBELOFF,[*] Senior Circuit Judge for the Fourth Circuit, and WRIGHT and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal follows appellant Bloomgarden's unsuccessful effort in the District Court to recover a $1 million finder's fee. The fee was sought for services leading to the inauguration of an enterprise to extensively develop certain property on the Georgetown waterfront in Washington. The principals in the enterprise are appellees Coyer and Guy, individual real estate developers, and appellee Georgetown-Inland Corporation (Georgetown-Inland), one of five companies organized, with Coyer and Guy as two of the stockholders in each, to effectuate the project. At the center of the controversy is Bloomgarden's assertion that it was he who brought the organizers together in this mutually beneficial venture and who, by the same token, should be rewarded for that contribution.

It is fully conceded that Bloomgarden introduced Coyer and Guy to those with whom they were later to join forces. There was, however, no express agreement, written or oral, pertaining to the part Bloomgarden played or calling for compensation therefor from any of the appellees. Bloomgarden's quest for a finder's fee proceeded on the theory that he was entitled to remuneration by virtue of a contract which should either be factually implied from prevalent custom and usage or recognized as a legal consequence of the transaction when viewed in light of the surrounding circumstances.

After the close of the pleadings and some amount of discovery, Bloomgarden moved for partial summary judgment on the issue of liability [1] and appellees for summary judgment on the entire case.[2] The District Court denied Bloomgarden's motion and granted appellees', in each instance on two separate grounds. The court held that because Bloomgarden did not hold the license required of real estate and business-chance brokers in the District of Columbia [3] he was precluded from charging for what he did. The court further held that Bloomgarden had no enforceable claim for recompense because it appeared without dispute that at the time he introduced the parties he did not expect to be personally compensated for so doing. Without reaching the first ground relied on by the District Court, we affirm for reasons underlying the second.

I

Bloomgarden's suit traces its origin to a series of events commencing in the fall of 1969 and extending into the spring of 1970. Throughout this period he was serving as president of Socio-Dynamics Industries, Inc. (SDI), a consulting and research firm in the field of urban and environmental affairs.[4] Nearly half of SDI's capital stock was owned by David Carley,[5] president of Public Facilities Associates, Inc. (PFA), which was engaged in the development of public and private housing and the redevelopment of urban areas.[6] Carley had requested

[*] Sitting by designation pursuant to 28 U.S. C. § 294(d).

1. See Fed.R.Civ.P. 56.

2. See id.

3. See D.C.Code § 45–1401 et seq. (1967).

4. SDI was organized in 1969 by David Carley and a business associate, each owning 45% of its capital stock. Bloomgarden

was made president at a fixed annual salary coupled with a 10% stock interest and an option to acquire another 10%.

5. See note 4, supra.

6. In February, 1970, PFA became a subsidiary of Inland Steel Company (Inland Steel), and in April its name was changed to Inland Steel Development Corporation (ISDC).

Bloomgarden to remain alert to any potentially fruitful investment opportunities for PFA in the Washington area.

At the time, Coyer and Guy held contracts or options on several parcels of real estate on the Georgetown waterfront. Bloomgarden met Coyer in the summer of 1969 while arranging to lease office space in a building in which Coyer had an interest. At one of their meetings, Coyer revealed to Bloomgarden the details of a plan for the assembly and development of a sizeable segment of the waterfront into a multipurpose business complex. Coyer explained that he and Guy lacked the financial resources needed to carry the project through, and Bloomgarden offered to put him in touch with Carley.

Bloomgarden promptly apprised Carley of Coyer's project and set up a meeting between them and others for January 26, 1970. Ideas were then exchanged but no suggestion was made by Bloomgarden to Carley or Coyer that he expected to be paid for bringing them together. By Bloomgarden's arrangement the group attended another meeting, on February 19 in Chicago, with representatives of subsidiaries of Inland Steel Company (Inland Steel).[7] Again the plan was discussed and again Bloomgarden gave no indication that he anticipated a fee for introducing Coyer and Guy to Carley and his Inland associates. On the contrary, during a ride to the airport on the day after the Chicago meeting, Guy inquired of Bloomgarden as to what he hoped to get out of the project, and Bloomgarden responded merely that possibly SDI, his company, might garner some work in implementing the plan.[8] Aside from furnishing three of the principals—Coyer, Guy and Carley—with information about the others, Bloomgarden had no further role in the transaction.

An agreement in principle was reached between Coyer, Guy and the Inland Steel group in early April, 1970.[9] This was formalized by a contract in June and a shareholders' agreement executed in August. Five corporations, among them Georgetown-Inland, were organized to handle the project.[10] It

7. As will appear, Inland Steel subsidiaries were later to assume a prominent role in the project contemplating development of the Georgetown waterfront. See notes 9–10, *infra*, and accompanying text.

8. The conversation, as portrayed by Bloomgarden on deposition, was:

Q. You had discussed the [SDI] role in this project in February with Mr. Coyer, had you not?

A. Yes, I had in the cab coming from the Palmer House to the airport . . . . Bill Guy said to me at some point and not in any context—I don't even know what we were discussing—he surprised me with the question, "Hank, if this project goes through, what do you expect out of it?" And I really wasn't prepared for the question because I had not thought it through in detail and I really didn't know in detail what I expected out of it. I expected something out of it and something substantial. I said, "Well, for one thing we have some capability in the environmental field and Chuck Coyer mentioned a possibility of a closed energy system here," and I said "We might be involved in that kind of thing." That was about the whole conversation.

We did not at that point discuss a finder's fee or anything else.

9. By this time PFA, Carley's firm, had become ISDC, a wholly-owned subsidiary of Inland Steel. See note 6, *supra*. The April agreement provided that if after further study ISDC decided to proceed with the Georgetown waterfront project, a new organizational structure for developmental purposes would be erected. The agreement further provided that ISDC would have the principal financing responsibility, Coyer and Guy the principal responsibility for assembling and acquiring the land, and that ISDC would share profits and losses with Coyer and Guy on an 80–20 basis.

10. The stock of each of the corporations was allocated 80% to ISDC and 10% to Coyer and Guy each. ISDC became obligated to finance the costs of land purchase and development.

Only one of the five new corporations—Georgetown-Inland—was made a party to Bloomgarden's lawsuit, and his motion to add the other four apparently was never ruled on by the District Court. In the view we take of the case, that is without consequence.

was not until the end of March, 1970, however, that Bloomgarden asserted any monetary claim on behalf of SDI for bringing about the initial contact, and it was not until May that he asked for compensation for himself.[11] After each of these demands was rejected, Bloomgarden, on September 14, wrote to Coyer, again claiming a fee for sparking the business opportunity culminating in the Georgetown project. That likewise failing, Bloomgarden commenced his suit on October 1.

## II

The District Court's judgment rested, as we have said, on two bases. The court ruled that since Bloomgarden was not licensed as a real estate or business-chance broker by the District of Columbia,[12] he could not recover pay for his contribution to the Georgetown venture.[13] The court also held that, as a matter of law, Bloomgarden was not entitled to relief because at the time he assisted appellees he had no expectation of personal reward for his efforts. Since our analysis leads us to a conclusion similar to the District Court's second reason, it is unnecessary here to consider the applicability of the licensing statute to Bloomgarden's activities.

Bloomgarden, we reiterate, sought a finder's fee on a twofold basis. He said that an agreement to pay such a fee, though not express, might be implied from the circumstances in which he brought the parties together, particularly in view of an alleged custom to reward those who discover advantageous business opportunities for others. Bloomgarden also said that in the context in which he introduced the parties, they came under a legal obligation—a quasi-contract—to compensate him for his services whether or not the elements of an enforceable contract were present. On this appeal Bloomgarden adds the contention that the District Court's disposition of his action by summary judgment was improper because there were important issues of fact, and because appellees had not demonstrated the validity of the legal position which the court accepted.

In reviewing the propriety of a summary judgment, it is our responsibility to determine whether there was any issue of fact pertinent to the ruling and, if not, whether the substantive law was correctly applied.[14] The summary judgment procedure is properly and wholesomely invoked when it eliminates a useless trial[15] but, of course, not when it would cut a litigant off from his right to have a jury resolve a factual issue bearing significantly on the outcome of the litigation.[16] The party moving for summary judgment bears the burden of demonstrating the absence of a genuine

---

11. The change from a company to a personal claim resulted from SDI's ultimate decision not to participate in the Georgetown waterfront project. On October 30, 1969, Carley had entered into a five-year employment contract with Inland Steel, effective January 22, 1970, by which Carley bound himself to full-time service for one of Inland Steel's divisions and agreed that he would not become financially interested in any business which was competitive with his new employer. After the Georgetown project was agreed upon, Bloomgarden requested SDI to take part, but Carley, because of his employment relationship, felt that SDI should avoid any business undertaking involving Inland Steel or ISDC. SDI's board of directors sustained Carley's decision.

12. D.C.Code § 45–1401 (1967).

13. D.C.Code § 45–1407 (1967).

14. Fed.R.Civ.P. 56; Vickery v. Fisher Governor Co., 417 F.2d 466, 468 (9th Cir. 1969); 6 J. Moore, Federal Practice ¶ 56.27 [1] at 2973 (2d ed. 1972).

15. See Nyhus v. Travel Management Corp., 151 U.S.App.D.C. 269, 271, 466 F.2d 440, 442 (1972); Semaan v. Mumford, 118 U.S.App.D.C. 282, 283, 335 F.2d 704, 705 (1964); 6 J. Moore, Federal Practice ¶ 56.04 [1] (2d ed. 1972).

16. Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944); National Life Ins. Co. v. Silverman, 147 U.S.App.D.C. 56, 71, 454 F.2d 899, 914 (1971).

issue as to any material fact,[17] and even where his opponent comes forth with nothing, summary judgment must be denied if the facts supporting the motion do not establish the nonexistence of such an issue.[18] Likewise, summary judgment must be denied where the movant fails to show his entitlement to a favorable determination as a matter of law.[19] Thus, to be upheld, the summary judgment under review must withstand scrutiny on both its factual and legal foundations.

In the case at bar, the District Court, relying on Bloomgarden's own deposition, as was its prerogative in evaluating the summary-judgment motions made by the parties,[20] concluded that Bloomgarden did not contemplate personal remuneration for his services, and that in consequence he lacked an indispensable prerequisite to recovery on either an implied-in-fact contract or a quasi-contract. Like the District Court, we are unable to perceive any factual basis upon which it could be asserted that, at the time he introduced the parties,[21] Bloomgarden looked forward to any finder's fee for himself, as distinguished from a fee and future business for his company. His silence on the matter at the January meeting in Washington and again at the February meeting in Chicago, followed by his statements on the day after the Chicago meeting[22] and later in his deposition,[23] indicated unequivocally that at most the gain he then anticipated was work and compensation for SDI, of which he was president. Bloomgarden summed it up when in his deposition he said:

It was always my intention that [SDI] should benefit, not myself personally, from putting Inland and Coyer together. [SDI] should have the credit; that [SDI] should get work assignments and that a finder's fee should be paid to [SDI]. It wasn't until I was told that I could not bring suit in the name of [SDI] and was urged to see if I wanted to sue Coyer as an individual that I began to recognize that I was in a very, very difficult spot.[24]

In addition, the pleadings and depositions reveal that it was not until after Bloomgarden had done his service for the parties that they were put on notice that he had in mind a finder's fee, either for his company or for himself. Both Coyer and Guy avowed in their depositions that they thought Bloomgarden was acting either for SDI or Carley when in January he made the introductions. Their understanding in that regard was buttressed in February by Bloomgarden during the ride to the Chicago airport when, asked pointedly as to his expectations, he omitted reference to individual recompense and replied simply that he had in view the possibility

17. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ; Underwater Storage, Inc. v. United States Rubber Co., 125 U.S.App. D.C. 297, 300, 371 F.2d 950, 953 (1966) ; Wittlin v. Giacalone, 81 U.S.App.D.C. 20, 21, 154 F.2d 20, 21 (1946).

18. Adickes v. S. H. Kress & Co., *supra* note 17, 398 U.S. at 160, 90 S.Ct. 1598.

19. Evers v. Buxbaum, 102 U.S.App.D.C. 334, 335, 253 F.2d 356, 357 (1958) ; Dean Constr. Co. v. Simonetta Concrete Constr. Corp., 37 F.R.D. 242, 245 (S.D. N.Y.1965) ; PAC Constr. Co. v. New York Factors, 191 F.Supp. 643, 646 (W.D.Pa.1961).

20. Fed.R.Civ.P. 56(e) ; 6 J. Moore, Federal Practice ¶ 56.11 [1–3] (2d ed. 1972).

21. See notes 35, 66, *infra.*

22. See note 8, *supra.*

23. See text *infra* at note 24.

24. The events referred to in the last sentence of the quoted material occurred when SDI decided not to take part in the Georgetown project, and that decision was not made until long after the parties had been brought together. See note 11, *supra.* Thus, by Bloomgarden's own statement—which harmonizes with all else in the record—his expectation was at most a benefit for his company, rather than for himself, at the time he introduced the parties.

that his company would receive work assignments flowing from the Georgetown project if it materialized.[25]  Moreover, Bloomgarden admitted in his deposition that not until the end of March—long after completion of the services for which remuneration was demanded—did he suggest compensation for SDI, his company, and not until May did he indicate that he anticipated personal compensation.

■■  Against these damaging incidents and admissions—the underpinnings of appellees' motion for summary judgment—Bloomgarden advanced nothing more than the bare conclusory allegations of his complaint.  We are mindful that on a motion for summary judgment the inferences to be drawn from the factual material before the court must be viewed in the light most favorable to the party opposing the motion.[26] But we also recognize that in order to raise a material issue of fact precluding the grant of a properly supported motion for summary judgment, more is necessary that mere assertions in the pleadings.[27]  Our careful examination of the record leads us to concur with the District Court that appellees bore their burden as to the nonexistence of any genuine factual issue, and that Bloomgarden offered nothing substantial to bar their request for summary judgment.[28]  It remains for us to determine whether the principles of substantive law governing recovery on contracts implied in fact and quasi-contracts were correctly applied.[29]

## III

■  Despite the marked dissimilarity of contracts implied in fact to quasi-contracts, their separate characteristics have been blurred by courts and commentators over the years.  For any satisfactory understanding of Bloomgarden's twofold legal approach, it is important to keep the two concepts clear and distinct.[30]  An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt.[31]  A quasi-contract, on the other hand, is not a contract at all, but a duty thrust under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment.[32]  The principles governing the two remedies differ, though in particular cases they may dictate the same result.

■  It is well settled that, in order to establish an implied-in-fact contract to pay for services, the party seeking payment must show (1) that the services were carried out under such circumstances as to give the recipient reason to understand (a) that they were performed for him and not for some other person, and (b) that they were not rendered gratuitously, but with the expectation of compensation from the recipient;

---

25. See note 8, *supra.*

26. Adickes v. S. H. Kress & Co., *supra* note 17, 398 U.S. at 157, 90 S.Ct. 1598; United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Nyhus v. Travel Management Corp., *supra* note 15, 466 F.2d at 442; Semaan v. Mumford, *supra* note 15, 118 U.S.App.D.C. at 283, 335 F.2d at 705.

27. Fed.R.Civ.P. 56(e); Richardson v. Rivers, 118 U.S.App.D.C. 333, 336, 335 F.2d 996, 999 (1964); Dewey v. Clark, 86 U.S. App.D.C. 137, 141, 180 F.2d 766, 770 (1950).

28. See text *supra* at note 14.

29. Compare Koepke v. Fontecchio, 177 F. 2d 125, 127 (9th Cir. 1949).

30. For a discussion of the distinction between quasi-contracts and contracts implied in fact, see 1 Williston, Contracts § 3A (3d ed. 1957).

31. Roebling v. Anderson, 103 U.S.App.D.C. 237, 241, 257 F.2d 615, 619 (1958); Crosby v. Paul Hardeman, Inc., 414 F.2d 1, 7 (8th Cir. 1969); Woodruff v. New State Ice Co., 197 F.2d 36, 38 (10th Cir. 1952).

32. See text *infra* at notes 43–51.

and (2) that the services were beneficial to the recipient.[33]

Particularly where commission-type fees are sought in business-opportunity transactions, such a contract will not be implied unless the recipient knows or has reasonable grounds to believe that the beneficial acts were performed in anticipation of remuneration therefor.[34] The reasons underlying these requirements are evident. Activities beneficial to a party frequently proceed on behalf of another. Often they are engaged in without thought of remuneration. Not uncommonly, and irrespective of motivation, they are not really helpful to the recipient. An agreement to pay for services defies implication where the recipient not unreasonably fails to realize that the services were rendered for him in contemplation of *quid pro quo* for value conferred. And the point in time at which the elements essential to implication must concur is the time at which the services are rendered.[35]

We may assume on the record before us that Bloomgarden's introductions were valuable to appellees, or that at least there was a genuine issue as to whether they were. Yet, for Bloomgarden to recover on the basis of a contract implied in fact, he would have to show additionally that he looked forward to personal payment for his services, and that the circumstances under which he introduced Coyer and Guy to Carley were such as would reasonably have put them on notice that he had that in mind. From aught that appears from the record, Bloomgarden could not have met these standards at a trial.

Bloomgarden's claim of an implied-in-fact contract is not unlike that rejected by the Eighth Circuit in Maple Island Farm v. Bitterling.[36] Bitterling was an American citizen who for a number of years had lived in Latin America, and who had utilized his knowledge of the language and the countries to represent foreign companies doing business there.[37] In 1945, he called at the offices of Maple Island Farm, a Minnesota milk producer,[38] with a view to negotiating an agreement with Maple Island whereby he and a Venezuelan corporation of which he was president would be named the exclusive agent for importing and marketing Maple Island's products in Venezuela. Maple Island initially rejected Bitterling's offer but accepted several of his suggestions regarding name and label changes on products for sale in Spanish-speaking countries, and the negotiations for the Venezuelan distributorship continued.[39] In the meantime, Bitterling accompanied a Maple Island representative on a trip to Mexico in search of a distributor for milk in that country, and thereafter Bitterling asked

33. Maple Island Farm v. Bitterling, 209 F.2d 867, 871–872 (8th Cir. 1954); Thompson v. United States, 308 F.2d 628, 633 (9th Cir. 1962); Woodruff v. New State Ice Co., *supra* note 31, 197 F.2d at 38; Batts v. Snook, 268 Ky. 682, 105 S.W.2d 843, 846 (1937); Kimbrough v. Smith, 201 Miss. 202, 28 So.2d 850, 853 (1947); Ford v. Gibson, 191 Va. 96, 59 S.E.2d 867, 870 (1950); Segnitz v. A. Grossenbach Co., 158 Wis. 511, 149 N.W. 159, 160 (1914).

34. City Builders' Finance Co. v. Stahl, 90 Fla. 357, 106 So. 77, 78 (1925); Western Oil Ref. Co. v. Underwood, 83 Ind. App. 488, 149 N.E. 85, 86 (1925); In re Coho's Trust, 421 Pa. 448, 219 A.2d 657, 658–659 (1966).

35. That is because an implied-in-fact contract to compensate for services arises, if at all, at the time the services are rendered, and only if the then-existing circumstances enable implication of a contract does it come into being. These precepts are elemental, and so much is implicit in the decisions holding that services performed without expectation of remuneration or simply in expectation of a nonmonetary business advantage do not warrant implication of a contract to pay. In all of these cases there was at some point a change of heart, and an effort in the suit to recover cash compensation not contemplated when the acts were performed. See cases cited *supra* note 33.

36. *Supra* note 33.

37. *Id.* at 869.

38. *Id.* 209 F.2d at 870.

39. *Id.*

Maple Island for a commission on all future sales made there. Maple Island refused him the commission and instead gave him a check to cover his expenses.[40] Bitterling then sued for the commission on an implied-in-fact contract theory, and was successful in the District Court. On appeal, however, his recovery was reversed.[41]

The Court of Appeals found on the basis of the record that Bitterling did not expect cash compensation for the advice he had rendered in connection with Maple Island's Mexican sales, but that his volunteered services were wholly incidental to the continuing negotiations respecting his possible selection as the dairy farm's agent in the much larger market of Venezuela,[42] and that his assistance was offered in the hope of obtaining a gainful connection with Maple Island in that market.[43] The court held that a contract to pay for services will not be implied where the actions are performed for business reasons without thought of direct cash compensation,[44] and that no recovery can be had for preliminary services rendered simply with the idea of obtaining business through a hoped-for contract.[45]

■■■ In no significant degree is the case before us distinguishable from *Maple Island*. The record establishes without controversy that Bloomgarden introduced appellees on the chance that a coa-

lition to develop the Georgetown waterfront would eventually produce business for SDI, his company, and that appellees reasonably understood that his activities were directed solely to that end.[46] The record further establishes that even if Bloomgarden then entertained the notion of charging a finder's fee,[47] appellees were not alerted to that possibility until long after his activities had ended.[48] On these uncontradicted bases we find ample legal support for the District Court's conclusion that Bloomgarden failed to show an implied-in-fact contract supporting his claim.

## IV

■■■ We turn finally to examine the sufficiency of Bloomgarden's quasi-contract theory as a basis for recovery of the finder's fee which he sought. At the outset, we again call attention to the need for conceptual clarity.[49] The quasi-contract, as we have said, is not really a contract, but a legal obligation closely akin to a duty to make restitution.[50] There is, of course, no need to resort to it when the evidence sustains the existence of a true contract, either express or implied in fact.[51] For the purpose of preventing unjust enrichment, however, a quasi-contract—an obligation to pay money to another—will be recognized in appropriate circumstances, even though no intention of the parties to bind themselves contractually can be discerned.[52]

40. *Id.* at 870–871.

41. *Id.* at 873.

42. *Id.* at 872.

43. *Id.*

44. *Id.* at 871–872.

45. *Id.*

46. See text *supra* at note 25.

47. See text *supra* at note 24.

48. See text *supra* following note 25.

49. See text *supra* at note 30.

50. See Roebling v. Anderson, *supra* note 31, 103 U.S.App.D.C. at 241, 257 F.2d at 619; Schenley Distillers Corp. v. Kinsey Distilling Corp., 136 F.2d 350, 352 (3d

Cir. 1943); Miller v. Schloss, 218 N.Y. 400, 113 N.E. 337, 339 (1916).

51. Roberge v. Cambridge Cooperative Creamery, 248 Minn. 184, 79 N.W.2d 142, 150 (1956).

52. Roebling v. Anderson, *supra* note 31, 103 U.S.App.D.C. at 241, 257 F.2d at 619; Schenley Distillers Corp. v. Kinsey Distilling Corp., *supra* note 50, 136 F.2d at 352; Fayette Tobacco Warehouse Co. v. Lexington Tobacco Bd. of Trade, 299 S.W.2d 640, 643 (Ky.), cert. denied, 355 U.S. 824, 78 S.Ct. 32, 2 L.Ed.2d 39 (1957); 1 Williston, Contracts § 3 (3d ed. 1957). Relief by quasi-contract is really an equitable remedy which the common law labeled a contract in order to fit it into the procedural mold of assumpsit

And where, as here, the essential facts are not in dispute, the question whether a quasi-contract should be erected is one of law,[53] and as such is a proper subject for summary disposition.[54]

Generally, in order to recover on a quasi-contractual claim, the plaintiff must show that the defendant was unjustly enriched at the plaintiff's expense, and that the circumstances were such that in good conscience the defendant should make restitution.[55] Because quasi-contractual obligations rest upon equitable considerations, they do not arise when it would not be unfair for the recipient to keep the benefit without having to pay for it.[56] Thus, to make out his case, it is not enough for the plaintiff to prove merely that he has conferred an advantage upon the defendant, but he must demonstrate that retention of the benefit without compensating the one who conferred it is unjustified.[57] What must be resolved here is whether Bloomgarden made such a showing or evinced his capability of possibly doing so at trial.

By their very nature, the equitable principles of quasi-contracts are more difficult to apply where the court must determine whether services rendered by one person to another are to go unrewarded than where it must make that determination with respect to money or property unjustly retained. But since there is no general responsibility in quasi-contract law to pay for services *irrespective* of the circumstances in which they are carried out,[58] a number of factual criteria have been utilized by courts to ascertain whether in a given case the defendant has undeservedly profited by the plaintiff's efforts. Thus, in situations involving personal services, it has been variously stated that a duty to pay will not be recognized where it is clear that the benefit was conferred gratuitously or officiously, or that the question of payment was left to the unfettered discretion of the recipient.[59] Nor is compensation mandated where the services were rendered simply in order to gain a business advantage.[60] And the courts have reached the same conclusion where the

long before equitable doctrines became fully developed. Fayette Tobacco Warehouse Co. v. Lexington Tobacco Bd. of Trade, *supra*, 299 S.W.2d at 644.

53. United States v. O. Frank Heinz Constr. Co., 300 F.Supp. 396, 399 (S.D.Ill.1969); Cottingham v. National Mut. Church Ins. Co., 290 Ill. 26, 124 N.E. 822, 825 (1919); Hartford Fire Ins. Co. v. Wade, 208 Okl. 573, 257 P.2d 1064, 1067 (1953); Mead Bros. v. State Indus. Comm'n, 144 Okl. 279, 291 P. 571, 572 (1930).

54. See text *supra* at notes 26–29.

55. Chase Manhattan Bank v. Banque Intra, S.A., 274 F.Supp. 496, 499 (S.D.N.Y. 1967). See also cases cited *infra* notes 56–62.

56. Roebling v. Dillon, 109 U.S.App.D.C. 402, 403, 288 F.2d 386, 387, cert. denied, 366 U.S. 918, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961); Osborn v. Boeing Airplane Co., 309 F.2d 99, 102 (9th Cir. 1962); Templeton Patents Ltd. v. J. R. Simplot Co., 220 F.Supp. 48, 60 (D. Idaho 1963).

57. Roebling v. Dillon, *supra* note 56, 109 U.S.App.D.C. at 403, 288 F.2d at 387; Chandler v. Washington Toll Bridge

Authority, 17 Wash.2d 591, 137 P.2d 97, 102 (1943); Kerr v. King County, 42 Wash.2d 845, 259 P.2d 398, 403 (1953); Restatement of Restitution § 1, comment c (1937).

58. Dunn v. Phoenix Village, Inc., 213 F. Supp. 936, 952 (W.D.Ark.1963).

59. Osborn v. Boeing Airplane Co., *supra* note 56, 309 F.2d at 102; Restatement of Restitution §§ 2, 112 (1937).

60. Dunn v. Phoenix Village, Inc., *supra* note 58, 213 F.Supp. at 956; Gould v. American Waterworks Serv. Co., 52 N.J. 226, 245 A.2d 14, 16–17 (1968), cert. denied, 394 U.S. 943, 89 S.Ct. 1274, 22 L.Ed.2d 477 (1969); Anderson v. Distler, 173 Misc. 261, 17 N.Y.S.2d 674, 679 (Sup. Ct.1940). Each of these cases involved an attempt to recover compensation for activities which the plaintiff engaged in for the purpose of securing future business with the defendant or others. Together the cases indicate a parallel line of authority in quasi-contract to the same principle applied to contracts implied in fact in Maple Island Farm v. Bitterling, *supra* note 33, discussed in text *supra* at notes 37–45. See Restatement of Restitution §§ 40–41 (1937).

plaintiff did not contemplate a personal fee,[61] or the defendant could not reasonably have supposed that he did.[62] As one court has pointed out:

> . . . chagrin, disappointment, vexation, or supposed ingratitude cannot be used as a subsequent basis for a claim for compensation where none was originally intended or expected.[63]

Nor, we add, can an uncommunicated expectation of remuneration serve the plaintiff's purpose where the defendant had no cause to believe that such was the fact.[64]

■ Thus we come full circle to the identical considerations which were dispositive of Bloomgarden's claim for recovery on an implied-in-fact contract.[65] There simply was no basis on which a jury could rationally find that when he brought the parties together [66] he entertained any thought of a finder's fee for himself,[67] or that those with whom he dealt held the payment of such a fee in prospect.[68] These circumstances defeat Bloomgarden's quasi-contract claim as well.[69] On what emerges clearly and undisputably from the record, we find that the District Court was fully warranted in holding that, as a matter of law, Bloomgarden was not entitled to recover on either a contract implied-in-fact or a quasi-contract, and its action in so doing is accordingly

Affirmed.

61. Osborn v. Boeing Airplane Co., *supra* note 56, 309 F.2d at 102; Dunn v. Phoenix Village, Inc., *supra* note 58, 213 F.Supp. at 956; William A. Meier Glass Co. v. Anchor Hocking Glass Corp., 95 F.Supp. 264, 269 (W.D.Pa.1951); Bellanca Corp. v. Bellanca, 53 Del. 378, 169 A.2d 620, 623 (1961); Anderson v. Distler, *supra* note 60, 17 N.Y.S.2d at 679; Kerr v. King County, *supra* note 57, 259 P.2d at 403.

62. Bellanca Corp. v. Bellanca, *supra* note 61, 169 A.2d at 623. Recovery for the value of services which have inured to another's benefit is not generally allowed unless they were received with reason to know that compensation was expected for them. 13 S. Williston, Contracts § 1575 (3d ed. 1970).

63. Anderson v. Distler, *supra* note 60, 17 N.Y.S.2d at 679.

64. See note 62, *supra*.

65. See Part III, *supra*.

66. As in the instance of an implied-in-fact contract, the circumstances allegedly creating a quasi-contractual obligation to pay for services must have existed when the services were performed. No unfairness results from a denial of compensation to the claimant who had no expectation of personal remuneration at the time of performance. On the contrary, it would be unjust to impose a liability for payment on the party who accepts the services without any warning, from the surrounding circumstances or otherwise, that they were rendered for a price.

67. See text *supra* at notes 20–24.

68. See text *supra* at note 25.

69. Appellant relies on Bradkin v. Leverton, 26 N.Y.2d 192, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970) and Miller v. Stevens, 224 Mich. 626, 195 N.W. 481 (1923), but these cases are distinguishable. In *Bradkin*, the plaintiff had an enforceable written contract with his employer, a finance company, to receive a finder's fee for every corporation in need of financing which he found. On one occasion, the plaintiff found a company interested in borrowing money, but the defendant, an officer of plaintiff's employer, made the loan personally to the company, thereby depriving the plaintiff of his fee. The court upheld the plaintiff's quasi-contractual recovery against the officer, 309 N.Y.S.2d 192, 257 N.E.2d at 647. In the instant case, there was no written contract, nor was there any action by appellees which deprived Bloomgarden of that which was rightfully his. In *Miller*, there was a suit for compensation by a plaintiff who had found a purchaser for a dye plant which the defendant wished to sell. The court affirmed a verdict for the plaintiff, holding that the facts raised a jury question on the issue of the plaintiff's intent to be compensated. 195 N.W. at 483. In contrast, Bloomgarden, by his own admission, had no intention of receiving payment personally from appellees when he introduced them.